NATIVE ALASKAN RECLAMATION AND PEST CONTROL, INC., an Alaskan Corporation, Appellant and Cross-Appellee,

v.

UNITED BANK ALASKA, an Alaskan Banking Association, Appellee and Cross-Appellant.

Nos. 6861, 6925.

Supreme Court of Alaska.

March 23, 1984.

As Modified on Denial of Rehearing June 15, 1984.

Bruce E. Gagnon, Patrick B. Gilmore, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellant and cross-appellee.

Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellee and cross-appellant.

Before BURKE, C.J., RABINOWITZ and COMPTON, JJ., and HANSON, Superior Court Judge.*

## OPINION

BURKE, Chief Justice.

This appeal arises out of an action for breach of contract.

## I. FACTS AND PROCEEDINGS

Appellant, Native Alaskan Reclamation and Pest Control, Inc. [NAR–PC], is a closely held Alaskan corporation engaged in the business of specialty contract flying. NAR–PC's business activities include the operation of fire retardant aircraft in the suppression of wild fires for the federal government and the State of Alaska. NAR–PC's chief executive officer and principal shareholder is Lester Risley.

In mid-1977, Risley learned that eleven Grumman TS2A ["S–2"] United States military aircraft were to be sold as surplus in Japan. Desiring to purchase and convert the planes to aircraft suitable for use in the suppression of forest fires, Risley contacted the appellee, United Bank Alaska [UBA], in an attempt to obtain financing for the S–2 project. Jerry Sutton, a UBA loan officer, expressed interest in the project, and Risley flew to Japan in late

September, 1977, to inspect the planes. Being favorably impressed with the planes' condition, Risley submitted a bid in October, which was accepted by the United States government on January 13, 1978.

UBA agreed to help finance the project and on January 27, 1978, UBA and NAR–PC entered into a standard loan agreement. UBA agreed to loan NAR–PC $200,000 and NAR–PC promised to repay the loan with 12% interest. As collateral for the loan, NAR–PC assigned its interest in all parts and inventory owned by NAR–PC, and its interests in six of the eleven S–2 planes purchased in Japan. NAR–PC also assigned all monies receivable under NAR–PC's BLM contract No. 81–0013. Risley provided a personal guarantee on the loan as well.

In connection with the S–2 loan, Risley presented UBA with a self-prepared financial statement showing a net worth of approximately $1,200,000 as of January 10, 1978. Over $820,000 of this amount was attributable to corporate stock owned by Risley. Sutton interpreted this financial statement as yielding a "Tangible Net Worth" of $107,651. This figure represented the "funds that Mr. Risley within a short period of time, ... say 12 months, could turn into ready cash."

The planes were subject to forfeiture if NAR–PC failed to remove them by March 14, 1978. Risley planned to minimally refurbish the planes so that they could be flown from Japan to Taiwan. Upon arrival in Taiwan, the planes would be converted for use in fire fighting, rendered airworthy by Air Asia, Ltd., and then flown to the United States. The total cost of refurbishing and converting all eleven S–2's was estimated at $1,200,000.

Risley planned to use the UBA loan, NAR–PC's contract revenues, and his personal resources to return one or two S–2's to the United States. With the plane or planes in the United States as collateral, Risley could then obtain long term financ-

* Hanson, Superior Court Judge, sitting by assignment made pursuant to Article IV, Section 11, of the Constitution of Alaska.

ing to pay off the UBA loan and finance the delivery of one or two more S–2's. The process would be repeated until all eleven S–2's had been delivered.

Upon execution of the loan documents, UBA immediately advanced $100,000 to NAR–PC which was used to pay part of the S–2 purchase price and project expenses. On April 13, 1978, the balance of the loan was committed to Air Asia, Ltd., in Taiwan, in the form of a $100,000 letter of credit, which was to expire on June 30, 1978.

The project, however, did not go as smoothly as planned. The Japanese had apparently removed parts and replaced them with inoperable parts. Risley estimated that the S–2 project would incur additional costs of $100,000 as a result of this parts "cannibalization." Risley also encountered problems with Japanese customs which were not resolved until late April. It was not until mid-May that several planes were ready to be ferried to Taiwan.

In early June, Sutton, apparently following orders from his supervisors, notified Risley that UBA would not honor the letter of commitment and that no further credit would be extended to NAR–PC. Sutton also informed Risley that UBA requested that all existing loans be paid off as soon as possible and that NAR–PC and Risley transfer their business to another lending institution.

Risley attempted to find replacement financing. NANA Regional Corporation turned down Risley's invitation to invest in the S–2 project. Security National Bank and National Bank of Alaska also denied Risley's requests for a loan which would enable NAR–PC to repay all the money. Risley's application to the State of Alaska, Division of Business Loans, requesting a $300,000 loan ($150,000 to refinance the existing debt owed UBA, and $150,000 to finance the S–2 project), was denied as well. Risley's attempt to line-up individual investors, as opposed to institutional investors, likewise failed.

On July 28, 1978, the planes were forfeited and the United States government re-funded part of the purchase price, $82,-074.40, to Risley and retained $20,000.16 as liquidated damages. Risley delivered the refunded amount to UBA in partial payment of NAR–PC's loan. After a lawsuit and settlement between Risley and the United States government, Risley was given a second opportunity to purchase the eleven S–2's at the original price. Under this second bid, Risley had until January 23, 1979, to remove the S–2's. Being unable to find financing, Risley again forfeited his interest in the planes and suffered an additional $20,518.60 liquidated damages. Most of the planes were ultimately sold as scrap in Japan.

After failing to obtain refinancing, NAR–PC filed this action for breach of contract against UBA in September 1978, seeking specific performance of the loan agreement. UBA counterclaimed against NAR–PC alleging default on two promissory notes executed by NAR–PC prior to the S–2 loans.

The case was tried without a jury and the trial lasted six weeks. The court issued its first memorandum of decision on February 17, 1981. The court concluded that while UBA did breach the loan agreement, UBA was discharged from its obligation to pay NAR–PC damages since NAR–PC was unable to prove that it could have performed all of its obligations under the loan contract (i.e., paid off the $200,000 loan) had UBA not been in breach. The court also dismissed UBA's counterclaims without prejudice, finding that since the two promissory notes' collateral (a Cessna 402) had not yet been sold, the counterclaims were premature as no deficiency yet existed.

The lower court issued a second memorandum of decision on April 12, 1982, and a supplemental memorandum of decision on April 20, 1982, which changed the holding in the case on several important points. The court continued to find that UBA breached the agreement. The court, however, reversed itself on the discharge of duty to pay damages issue and, instead, concluded NAR–PC would have been able

to perform its contract obligations had UBA not breached the loan agreement. The court found that UBA's breach caused the damages alleged by NAR–PC, that NAR–PC took reasonable steps to mitigate its damages, and that UBA's affirmative defenses (misrepresentation, excuse, estoppel) were not supported by the weight of the evidence. The court found NAR–PC's damages to be:

(1) Reliance damages (expenses incurred prior to breach) $97,394.22.

(2) Mitigation damages (expenses incurred after breach in effort to save project) $86,705.97.

(3) Expectancy damages (money NAR–PC would have earned had UBA not breached) $2,921,605 which was then reduced by interest costs of $536,000 leaving total expectation damages of $2,385,605.

Despite its findings on damages, the court found that NAR–PC could only recover its mitigation damages. The court based this ruling on its finding that UBA, at the time of contracting, only had reason to foresee loss of the S–2 project as a *possible* result of its breach, not a *probable* result. The court felt that UBA could reasonably have expected NAR–PC to obtain a replacement loan, thereby saving the S–2 project. Therefore, no recovery was allowed for the reliance or expectation damages.

The court also changed its earlier ruling on UBA's counterclaims. Finding that UBA's failure to sell the Cessna 402 (collateral) was commercially unreasonable, the court concluded that the burden shifted to UBA to prove the value of the Cessna 402. UBA's failure to meet this burden resulted in the court finding that the two notes were satisfied in their entirety and that UBA was not entitled to a deficiency judgment. The court dismissed the two counterclaims with prejudice.

NAR–PC's principal argument on appeal is that the trial court erred in finding that NAR–PC's inability to obtain replacement financing and the resulting loss of the S–2 project were not foreseeable as a *probable* result of UBA's breach at the time of contracting. An ancillary argument is that the trial court erred in reducing NAR–PC's expectation damage figure by the amount of interest that NAR–PC would have paid on the loans necessary to deliver the eleven S–2's to the United States ($536,000).

UBA cross-appeals on several different issues. First, it argues that the trial court erred in finding that UBA breached the loan agreement. Second, it argues that its affirmative defense of misrepresentation should not have been dismissed. Third, it attacks the trial court's ruling on damages by asserting that the trial court erred in finding (a) that UBA's alleged breach *caused* NAR–PC's loss; (b) that NAR–PC could have performed its contractual obligations and that therefore UBA's duty to pay damages was not discharged; (c) that NAR–PC acted reasonably in mitigating its losses; and (d) that NAR–PC proved with reasonable certainty the market value of the delivered S–2's. UBA's final argument is that the trial court erred in dismissing its counterclaims with prejudice.

## II. UBA'S BREACH OF CONTRACT

UBA argues in its cross-appeal that the trial court erred in finding that UBA "through its loan officer Jerry Sutton, notified [NAR–PC] on or about June 3, 1978, that [UBA] would not honor its previously issued $100,000 letter of commitment to Air Asia." UBA asserts that the court should not have accepted the testimony of the "interested" witnesses who testified in support of NAR–PC over the testimony of a "disinterested" witness.

It is the job of the trial court, not the appellate court, to judge the credibility of the witnesses and to weigh conflicting evidence. *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980). The appellate court's task is to examine the record to insure that there is evidence supporting the trial court's decision. We will intervene only when convinced that the court's findings of fact are clearly erroneous. *Alaska Far East Corp. v. Newby*, 630 P.2d 533 (Alaska 1981).

Having reviewed the record, we cannot conclude that the trial court's finding of breach was clearly erroneous in the case at bar. Testimony by Risley, Sutton, Jenner, and Erskine, as well as a written memo by Sutton to UBA's S-2 loan file, support the trial court's finding that UBA did in fact breach the loan agreement by refusing to disburse funds under the $100,000 letter of credit. We therefore affirm the trial court's finding of breach by UBA.[1]

## III. DAMAGES

### A. *Causation*

The trial court found that NAR–PC had sufficient capital (approximately $86,000), which together with the $100,000 UBA letter of commitment would have enabled NAR–PC to pay for the conversion and delivery of the first S-2 to the United States. The court also found that NAR–PC would probably have been able to obtain "take-out" financing on each S-2 as it was delivered to the United States. This would have enabled NAR–PC to complete the work on the remaining S-2's and deliver them to the United States. Based on these findings, the court concluded:

> [S]ince the first S-2 could not be completed and delivered to the United States without the $100,000.00 from the UBA letter of commitment, the conclusion follows that the repudiation of the letter of commitment was a substantial factor in causing the loss of the remaining ten S-2's.

UBA, on cross-appeal, argues that the trial court's finding that NAR–PC could have successfully completed the S-2 project had UBA not breached is clearly erroneous. It bases its argument on the testimony and evidence which tended to show that NAR–PC had little working capital at the time of the breach and the testimony of UBA's expert witness, Schaedler, a C.P.A., who testified that operation of the S-2's in the fire fighting business would have resulted in a net loss.

NAR–PC argues in response that the record contains support for the trial court's findings. We agree. An examination of the exhibits and testimony reveals that there is ample support in the record for the trial court's findings despite the presence of some conflicting evidence.

We, therefore, conclude that UBA has failed to demonstrate that the trial court's findings on this issue were clearly erroneous and affirm the trial court's findings with regard to causation.

### B. *Discharge of Duty to Pay Damages*

UBA's next allegation of error is based upon the rule of contract law set forth in Restatement (Second) of Contracts § 254(1) at 289 (1981):

> A party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.

An equivalent statement of this principle of law is contained at 4 A. Corbin, Corbin on Contracts § 978, at 924 (1964).

UBA contends that NAR–PC could not have performed its contractual obligations even if UBA had not breached the loan agreement. It, therefore, argues that the trial court erred in failing to find that UBA's duty to pay damages was discharged.

As discussed above in section III A, there is ample evidence to support the trial court's findings on NAR–PC's ability to have successfully converted and delivered the S-2's to the United States. This finding alone, however, does not completely resolve this issue.

Under the rule of law cited above, UBA's duty to pay damages would be discharged

---

1. UBA's argument on cross-appeal that the trial court erred in finding that UBA failed to prove its affirmative defense of misrepresentation is without merit. UBA fails to persuade us that the trial court erred when it concluded that UBA failed to prove that Risley's estimates regarding his net worth were "anything more than mere estimates or that [Risley] deliberately or recklessly exaggerated the estimates in any respect."

only if it were shown that NAR–PC would have totally failed to perform its obligations under the loan agreement. A reading of the loan agreement reveals that the only act which NAR–PC was contractually obligated to perform was payment of the $200,000 loan according to the loan agreement's payment schedule.[2]

A review of the record reveals that there is much conflicting evidence on NAR–PC's financial situation at the time of UBA's breach. The trial court listened to six weeks of trial testimony and viewed all of the evidence prior to rendering its decision.

Reading the trial court's February 17, 1981 and April 12, 1982 memorandum decisions in conjunction, we conclude that the trial court did implicitly find that NAR–PC would have successfully paid off its $200,000 loan had UBA honored its letter of commitment. In its original February 17, 1981 decision, the court held that NAR–PC was undercapitalized and that therefore, even had UBA not breached the loan agreement, NAR–PC "would not have been able to perform its contractual duty to pay the $200,000 loan." In the April 12, 1982 decision, the court reversed itself after analyzing the expenses facing NAR–PC and the assets which NAR–PC in fact mustered in its attempt to bail itself out. It found that NAR–PC could have succeeded in its S–2 project. Implicit in this finding is the finding that NAR–PC would have been able to make timely payments on its UBA loan.

A review of the record does not leave us with "a definite and firm conviction ... that a mistake has been made." *Mathis v. Meyeres*, 574 P.2d 447, 449 (Alaska 1978). We therefore affirm the trial court's decision on this issue.

### C. *Duty to Mitigate*

The trial court found that UBA failed to prove that NAR–PC could have obtained a replacement loan or otherwise proceeded with the necessary work on the first S–2

through the exercise of reasonable effort. The court stated:

> The evidence showed numerous attempts by plaintiff to mitigate its damages, including several attempts to borrow sums substantially in excess of $100,000.00 and the expenditure by plaintiff of approximately $70,000.00 to prevent the forfeiture of the S–2's to the government while plaintiff sought replacement financing. Although plaintiff could have sought smaller loans than it did, the court is not able to conclude that plaintiff's efforts to mitigate were not reasonable.

At the time that UBA repudiated its obligation to honor the letter of credit, NAR–PC had outstanding loans owed to UBA in the approximate amount of $267,000: (1) $50,000 on the working capital line; (2) $100,000 disbursed on the S–2 project; and (3) $117,000 on a prior loan which financed the purchase of a Cessna 402. The trial court found that although UBA breached the S–2 loan, it did not breach the other two loans. Instead, the court found that UBA "requested but did not demand, that plaintiff pay its various loan balances to [UBA] as soon as reasonably possible."

UBA argues on cross-appeal that the trial court erred in finding that NAR–PC's mitigation efforts were reasonable since NAR–PC attempted to obtain replacement loans in amounts larger than $100,000. NAR–PC responds to this argument by contending that it was reasonable for NAR–PC to seek a replacement loan that not only would cover for the breached S–2 obligation, but also two other lines of credit that UBA "requested" be fully paid.

There is evidence in the record to support the trial court's finding that NAR–PC's actions were reasonable under the circumstances. Risley testified that at the time UBA repudiated the letter of credit, UBA informed him that 100% of NAR–PC's accounts receivable would be applied to pay off the $50,000 revolving line of credit and

**2.** UBA's assertions on cross-appeal, that NAR–PC was contractually obligated to get the aircraft to the United States within a reasonable period of time so that UBA could perfect its

security interest, and that payment of the loan had to be by revenue generated from use or sale of the S–2's, are without merit.

that 50% of the accounts receivable would thereafter be applied to pay off the S-2 loan. The peril to NAR–PC of this course of action was that the accounts receivable constituted NAR–PC's sole source of revenue. A memorandum in UBA's S-2 loan file and Sutton's testimony support Risley's testimony that accounts receivable were to be diverted to pay off the loans. Sutton testified that the effect of applying 100% of NAR–PC's accounts receivable to bank debts during June 1978 would be to "dry up [NAR–PC's] cash flow."

In light of this evidence, we conclude that the trial court's finding concerning NAR–PC's mitigation efforts was not clearly erroneous.[3]

### D. *Foreseeability*

The trial court found that UBA had reason to foresee at the time it entered into the loan agreement that its subsequent refusal to honor the letter of commitment could *possibly* cause the loss of the S-2's. "However, [UBA] did not have reason to foresee these consequences as a *probable* result of such a future refusal."

In further explanation of its conclusion, the court stated:

> On the contrary, no reason appears why UBA should not have felt very confident that plaintiff would be able to obtain a replacement loan quickly by simply giving the new lender the same type of unperfected security interest in the remaining five S-2's as UBA had accepted on six of them, plus a new guaranty signed by the Risleys and backed by their considerable $1.2 million net worth,

plus an assignment of the 1979 BLM contract which plaintiff appeared equally as certain to receive as had been the case with the 1978 BLM contract.

The trial court therefore framed the foreseeability issue in the following way: UBA was responsible for the expectation or reliance damages only if, at the time of contracting, UBA reasonably should have foreseen that NAR–PC would probably not be able to obtain a replacement loan for $100,-000. The trial court concluded that it was not foreseeable and therefore denied NAR–PC recovery of the expectation damages ($2,385,605.00) and reliance damages ($97,-344.22). NAR–PC's principal argument on appeal is that this finding of unforeseeability is erroneous.

■■■ We must first ascertain the appropriate standard of review. NAR–PC argues that since the underlying facts are not in dispute, the trial court's ruling on foreseeability is a question of law, not fact. However, 5 A. Corbin, Corbin on Contracts § 1012, at 89 (1964) provides:

> The question whether or not the defendant did in fact foresee, or had reason to foresee, the injury that the plaintiff has suffered is a question of fact for the jury
> . . . .

*E.g., Continental Plants Corp. v. Measured Marketing Service, Inc.,* 274 Or. 621, 547 P.2d 1368, 1372 (1976). We will therefore apply the "clearly erroneous" standard of review.

Alaska's law on foreseeability of damages is somewhat confused. In *Skagway City School Board v. Davis,* 543 P.2d 218 (Alaska 1975), the court quoted the *Hadley*

---

3. UBA alleges error in the computation of the mitigation damages arising from the inclusion of certain expenses: Risley's life insurance cost ($12,826.65); factoring fee for the BLM contract ($4,013.96); and 75% of NAR–PC's business space rental after June 1 ($16,314.00). The trial court found that NAR–PC's expenditures were for the purpose of attempting to keep the S-2 project alive while replacement financing was sought and that the reasonableness of the expenditures was established through Risley's testimony. UBA has failed to demonstrate that these findings were clearly erroneous.

UBA also argues that NAR–PC should be estopped to claim that its efforts to mitigate its damages were reasonable. This argument is based on UBA's belief that Risley materially misrepresented his net worth. UBA argues that had Risley's net worth been as represented, he could easily have replaced the $100,000 letter of credit from his own assets. The lower court rejected this argument for the same reasons that it rejected UBA's defense of misrepresentation. Because we have affirmed the trial court's finding that Risley did not materially misrepresent his net worth, we likewise find UBA's estoppel argument to be without merit.

*v. Baxendale* test.[4] It then noted that the test had undergone "some refinement at the hand of Mr. Justice Holmes" in *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903). In *Globe*, Justice Holmes, speaking for the court, stated:

It is true that, as people when contracting contemplate performance, not breach, they commonly say little or nothing as to what shall happen in the latter event, and the common rules have been worked out by common sense, which has established what the parties probably would have said if they had spoken about the matter. But a man never can be absolutely certain of performing any contract when the time of performance arrives, and, in many cases, he obviously is taking the risk of an event which is wholly, or to an appreciable extent, beyond his control. The extent of liability in such cases is likely to be within his contemplation, and, whether it is or not, should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind .... We have to consider, therefore, what the plaintiff would have been entitled to recover ... and that depends on what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.

*Globe*, 190 U.S. at 543–44, 23 S.Ct. at 755–56, 47 L.Ed. at 1173. This language is commonly referred to as the "tacit or presumed agreement" test of foreseeability of damages.

In a later case, *Arctic Contractors, Inc. v. State*, 564 P.2d 30, 44–45 (Alaska 1977), this court, in dicta, recommended the *Hadley* rule, but mentioned Justice Holmes'

"tacit agreement" test in a footnote. In *City of Whittier v. Whittier Fuel & Marine. Corp.*, 577 P.2d 216, 220 (Alaska 1978), after stating that the *Hadley v. Baxendale* rule is "the applicable rule in Alaska," we used language more closely aligned with Justice Holmes' "tacit agreement" test.

The "tacit agreement" test has come under attack in modern times. Restatement (Second) of Contracts § 351 comment a, at 135–36 (1981) states:

Furthermore, the party in breach need not have made a "tacit agreement" to be liable for the loss. Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee.

Moreover, 5 A. Corbin, Corbin on Contracts § 1009, at 77 (1964) provides:

The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation *or should have promised either impliedly or expressly to pay therefor in case of breach.*

(Emphasis added). To the extent that prior Alaska case law suggests adoption of the "tacit agreement" test, it is expressly disapproved. We find the Restatement test to be the clearest expression of Alaska's test of foreseeability of damages.

Restatement (Second) of Contracts § 351, at 135 (1981) provides:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

**4.** The *Hadley v. Baxendale* test for damages is: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally; i.e., according to the usual course of things, from such breach of contract itself, or such as may rea-

sonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach.
*Skagway City School Board*, 543 P.2d at 226, quoting from 5 A. Corbin, Corbin on Contracts § 1007, at 70 n. 1.5 (1964) which quotes from *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854).

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.[5]

The trial court found that damages which would have flowed from UBA's repudiation of the loan "in the ordinary course of events" were limited to mitigation damages, i.e., the expenses of

(1) obtaining a replacement loan,

(2) higher interest charges on the replacement loan,

(3) demobilizing the project and preserving the aircraft while seeking the replacement loan, and

(4) remobilizing the project after the replacement loans were obtained.

The court found that NAR–PC reasonably incurred expenses of this type worth $86,705.97.

NAR–PC's claims for expectation and reliance damages were found not to have been incurred in the ordinary course of events. The trial court rejected NAR–PC's argument that UBA was aware of details surrounding the S–2 loan which rendered NAR–PC's failure to obtain replacement financing foreseeable as a probable result of UBA's breach.

One circumstance which rendered UBA's S–2 loan unusual was the fact that security in the S–2 airplanes could not be perfected until the planes were delivered in the United States. The court found that if UBA accepted six of these planes as collateral on its $200,000 loan, it could have expected another bank to accept the other five planes as collateral on a $100,000 loan. This, however, misperceives the test. The proper inquiry is whether the fact that collateral could not be perfected until the planes were on United States soil would cause a reasonable lender to foresee that NAR–PC would not be able to find a replacement loan.

UBA officers who began working for UBA after the S–2 loan was entered into indicated at trial that they would not have taken the planes as collateral had they been involved with the bank at the time the loan was approved. Jenner stated in his deposition and at trial that he found it "appalling" that the bank would make a loan based on planes now in Japan as collateral. Mr. Erksine, UBA's president since April 1978, testified, "[w]e had security agreements on the airplanes, but in my experience, collateral is not worth much in a foreign country, until it's in your physical control in the United States." In addition, Conkle, an airplane appraisal expert with Bank of America, testified in his deposition that Bank of America had a policy against accepting aircraft located in foreign countries as collateral.

Therefore, it would appear that the trial court's reliance on UBA's prior action of accepting the planes as collateral was not well founded. The fact that UBA acted unreasonably in accepting the planes as collateral should not justify an inference that UBA could not foresee that another lender would refuse to act similarly, should UBA breach in the future. The refusal of other lenders to accept the remaining five planes as collateral, whether or not subjectively foreseen by UBA, should have been foreseeable to a reasonable lender in UBA's position.

---

**5.** This rule is applicable to breach of a contract to lend money. Comment e to § 351 states: Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of breach .... In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender. However, in the less common situation in which the lender has reason to foresee that the borrower will be unable to borrow elsewhere or will be delayed in borrowing elsewhere, the lender may be liable for much heavier damages based on the borrower's inability to take advantage of a specific opportunity ..., his having to postpone or abandon a profitable project ..., or his forfeiture of security for failure to make prompt payment....
*See also* 5 A. Corbin, Corbin on Contracts § 1078, at 447 (1964).

The trial court also noted that UBA could have expected other lenders to loan $100,-000 to NAR–PC based upon Risley's financial statement showing a net worth of $1.2 million. The court apparently rejected NAR–PC's argument that UBA should have known that other lenders would not have relied upon the net worth statement, since the statement showed that $820,000 of the $1.2 million derived from the value of stock owned in closely held corporations, an illiquid asset.

Again, statements by UBA's employees and officers are highly probative on the issue of how other bank officers might have viewed Risley's financial statement. UBA's loan officer, Sutton, analyzed the statement and determined that Risley had a "tangible net worth" of $107,651 (funds which Risley could turn into ready cash within 12 months). Jenner, after reviewing the S–2 loan, wrote a list of questions and comments, two of which were: "I can't see any real net worth behind this, especially when the planes are in [the] Orient" and "Inflated NW [net worth] for *our* benefit." Mr. Lentfer, who became UBA's executive vice-president in January 1979, testified that after examining Risley's personal financial statement, he concluded that the $200,000 appeared to be

> an unsecured advance to a company with a deficit net worth, with no source of repayment. . . .

We conclude that the trial court erred in placing as much reliance on Risley's statement of $1.2 million net worth as it did. The evidence at trial clearly indicated that a reasonable lender would probably not have accepted the $1.2 million net worth figure. The fact that UBA did rely on the statement should not have been used by the trial court as proof that it was therefore foreseeable that a "reasonable" lender would have done the same when UBA breached in June 1978.

NAR–PC also argued that UBA should have foreseen that UBA's act of withdrawing loan support for NAR–PC in breach of the loan agreement by itself, would dissuade other lenders from entering the picture and therefore render NAR–PC's inability to obtain a replacement loan all the more foreseeable. The trial court concluded that NAR–PC failed to establish such an impact on other lenders. While a review of the record supports the trial court's conclusion, that lack of evidence is irrelevant to our central inquiry, which is what losses did UBA have reason to foresee when the contract was made. Restatement (Second) of Contracts § 351(1) at 135 (1981). Surely UBA had reason to know when it chose to make the loan to NAR–PC that sudden repudiation of that loan would tend to make other lenders more cautious about lending money to NAR–PC. Despite this lack of evidence, however, common sense would indicate that a replacement lender would be more cautious about loaning money to NAR–PC after UBA's sudden withdrawal.

It is a close question whether or not the trial court clearly erred in concluding that it was not foreseeable that NAR–PC would be unable to obtain replacement financing. A review of the record leaves us with the general impression that UBA's loan officer Sutton acted unreasonably in recommending the S–2 loan without obtaining additional collateral, and the loan committee as it existed in January 1978 also acted unreasonably in approving the loan. When the new UBA officers took over, they attempted to clean house by getting rid of their predecessors' poor work. Erskine testified that when he took over in April 1978, he determined that many UBA loans contained sub-par loan documentation, inadequate collateral, insufficient credit information on the borrower, and inadequate prospects of repayment. NAR–PC's S–2 loan apparently fell in this category and by June 1978, UBA, under new management, quickly took steps to save itself by reneging on the letter of commitment and requesting accelerated payment on the outstanding loans.

We find the trial court's ruling on the foreseeability issue clearly erroneous. The trial court relied too heavily upon the fact that UBA issued the S–2 loan based on what UBA officers later recognized to be

inadequate collateral and insufficient documentation of Risley's net worth. The actions and testimony of UBA's own officers amply demonstrate that it was foreseeable that a reasonable lender would not have issued a replacement loan in reliance upon the planes as collateral and Risley's personal statement of self-worth.

▪▪▪ On remand, the trial court should reconsider its award of damages in light of Restatement (Second) of Contracts § 351(3) at 135 (1981).[6]

### E. *Certainty of Damages*

The trial court found that NAR–PC's expectation damages consisted of the net value of the eleven S–2's, minus the total of the interest payments that would have been incurred as a result of the UBA S–2 loan and the alternative long term financing. The court found this figure to be $2,385,605.[7] UBA attacks this finding on several grounds.

UBA first argues that the evidence regarding the plane's fair market value was insufficient, unreliable and speculative.

Risley testified as an expert appraiser that the S–2's converted and delivered were worth at a minimum $404,750. His testimony is corroborated by the testimony of Conkle, a qualified aircraft appraiser for Bank of America, who stated that the S–2's in question had a fair market value of "$400,000 plus." In addition, UBA responded to NAR–PC's request for admissions by admitting that it was in possession of a letter from the Field Aviation Company in which the company indicated that similar aircraft were being marketed in

Canada for $375,000 (US) and that import duties and additional necessary equipment would bring the price to $404,750 (US). UBA admitted that this was a "reasonable estimate" but denied that it was necessarily an "accurate estimate." UBA's argument as to the lower court's finding on fair market value is without merit. The record clearly supports the trial court's finding as to market value.

UBA next asserts that the lower court's finding of a cost of $139,149.54 for purchase, conversion and delivery of each plane was speculative and, therefore, clearly erroneous. The trial court apparently accepted Risley's actual and estimated projected costs for the purchase, conversion and delivery of each plane. This does not appear unreasonable as Risley was found at trial to have substantial experience at estimating costs of overhauling aircraft engines. Nackenhorst, the mechanic in charge of the conversion in Japan estimated the cost to convert and deliver each plane to be approximately $100,000 to $110,000.

Restatement (Second) of Contracts § 352, at 144 (1981) provides:

> Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.

Comment (a) to the above cited section states:

> Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should

---

6. Restatement (Second) of Contracts § 351(3) at 135 (1981) provides:

> A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

We note, however, that the mere fact that UBA only stood to gain interest payments on its loan under the contract, *i.e.* that it would not receive any profits of the S–2 purchase venture, is not sufficient reason to warrant a limitation on NAR–PC's damages recovery. We leave for the

trial court's determination whether any other factors may warrant application of a disproportionality theory. *See* Restatement (Second) of Contracts § 351(3) comment f (1981).

7. The trial court found that "the fair market value of the S–2's, after being converted, rendered airworthy and delivered to the United States, would have been $404,750.00 each." Cost of purchase, conversion, and delivery of each plane was found to be $139,149.54, leaving a net value of $265,600.46 per plane. Total loss of value to NAR–PC on all eleven S–2's was found to be $2,921,605.

not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Damages need not be calculable with mathematical accuracy and are often at best approximate.

■ Given the willfulness of UBA's breach in this case and the fact that UBA did not directly attack the accuracy of any of the figures contained in Exhibit 96, which contained a detailed and specific breakdown of the costs, we find UBA's allegation of error concerning the S–2's purchase, conversion and delivery cost per plane to be without merit.

The trial court's findings on the amount of expectation damages are affirmed.

### F. *Interest Deduction*

The trial court found that if its foreseeability ruling were later held to be incorrect, NAR–PC would only be entitled to recover the net value of the eleven S–2's ($2,921,605) "minus the total of the interest payments on the UBA loan and the long term financing ($536,000)." NAR–PC asserts that this interest deduction was erroneous as it resulted in NAR–PC being undercompensated, especially since NAR–PC was denied lost profits based on certainty of proof grounds.

This argument is without merit. Restatement (Second) of Contracts § 347, at 112 (1981) provides:

Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, *less*

(c) *any cost or other loss that he has avoided by not having to perform.*

(Emphasis added). *See also* 5 A. Corbin, Corbin on Contracts § 1038, at 236 (1964).

■ Clearly, NAR–PC would have had to pay interest on the money loaned to finance the S–2 project. Because of UBA's breach, NAR–PC avoided having to pay the interest cost. The interest cost was therefore properly deducted from the value of the S–2's.

### IV. DISMISSAL OF UBA'S COUNTER-CLAIMS

On August 26, 1977, UBA issued a loan of $121,327.06 to NAR–PC for the purpose of buying a Cessna airplane. NAR–PC put up the Cessna as collateral for the loan. On August 10, 1978, UBA issued a loan of $53,309 to NAR–PC for the purpose of extinguishing NAR–PC's prior indebtedness to UBA on two earlier loans: the remaining balance owed on the S–2 loan and the revolving working capital loan. There is no indication in the record that NAR–PC expressly provided any collateral for the second loan.

NAR–PC fell behind and then ceased to make payments on both loans. On March 10, 1980, UBA notified NAR–PC that both loans were in default and demanded either payment in full or delivery of the Cessna by April 1, 1980. NAR–PC gave up possession of the Cessna to UBA.

On April 28, 1980, a third party offered to buy the Cessna from UBA for $105,000. UBA apparently sent Risley notice of the offer and solicited Risley's opinion on the Cessna's fair market value. The letter, however, was never received by Risley. Although UBA recognized that it did not need NAR–PC's or Risley's consent, UBA took no further actions with regard to the Cessna's sale, and the Cessna was not sold.

On April 18, 1980, UBA filed two counterclaims to collect the debt owed by NAR–PC on the two loans. Trial began on July 10, 1980. The court, in its February 17, 1981 memorandum of decision, dismissed the two counterclaims without prejudice. It found that the claims were premature since the Cessna had not been sold and there was not yet a deficiency.

The court subsequently modified its decision so that the counterclaims were instead dismissed with prejudice. This action was based upon the court's finding that UBA acted commercially unreasonably by failing to contact NAR–PC's attorney regarding the value of the Cessna, failing to get an appraisal, and failing to make any attempts to sell the plane. The court took the position that the burden devolved upon UBA to show the value of the Cessna by clear and convincing evidence. Finding a failure of such proof, the court concluded that the Cessna entirely satisfied the debt owed on the two notes. It then dismissed the counterclaim with prejudice. UBA on cross-appeal asserts that the trial court committed error by dismissing both claims with prejudice.

The first issue this court must resolve is whether the lower court erred in finding that the Cessna was held as security on the 1910 Note.[8]

While no bank document states that the Cessna in particular was collateral on Note 1910 loan, language contained in the note does so generally. The note states:

> Any deposit or sums of any kind credited by or due from the Holder to the Maker and any securities or other property of the Maker in the possession of the Holder may at all times be held and treated as collateral for the payment of this Note....

The Cessna was in UBA's possession as a result of NAR–PC's default on Note 1190 and UBA clearly evidenced its intent to treat the Cessna as collateral on that note as well. Both in a letter to NAR–PC and in an internal memorandum, UBA expressly stated that it would not release its security interest in the Cessna until both notes were paid in full.

Further, the two constituent loans which were re-financed to create the second loan appeared to expressly state that the Cessna was collateral. The S–2 loan listed the Cessna as the second item of collateral underneath the first item listing six S–2 planes. The revolving working capital loan

as originally written listed collateral having a value of $149,000 but did not describe the collateral. However, Note 1190 lists the Cessna 402 and receivables under a state contract as collateral and sets their value at $149,000. So it is likely that the working capital loan had the same collateral as Note 1190.

■■ "The test under which a document is determined to be a security agreement is one of intent to create a security interest in the collateral." *Queen of the North, Inc. v. LeGrue*, 582 P.2d 144, 148 (Alaska 1978). UBA's letter and memorandum clearly evidence such intent. The trial court did not err in considering Note 1910 to be secured by the Cessna 402.

However, the trial court did erroneously apply the Uniform Commercial Code in other respects. The trial court apparently believed that UBA was obligated to sell the Cessna as soon as it was commercially reasonable to do so.

■■ A creditor's remedies under AS 45.09.501(a) are cumulative. Under this section, a creditor may seek the remedies provided for in AS 45.09.501—.507 and those provided for in the security agreement. In addition, the creditor may "reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedure." AS 45.-09.501(a).

■■ It is clear that under the case law, a creditor may enforce a debt in a judicial proceeding even though the creditor has the collateral in his possession. There is no requirement under the UCC that the creditor must first exhaust the collateral. *Keller v. La Rissa, Inc.*, 60 Hawaii 1, 586 P.2d 1017, 1020 (1978). *Cf. Kennedy v. Bank of Ephraim*, 594, P.2d 881, 883 (Utah 1979). The trial court, therefore, erred in finding that UBA acted commercially unreasonably by its failure to take steps to sell the Cessna as soon as was reasonably possible.

On remand, the trial court should determine whether or not UBA's failure to sell

---

**8.** The parties do not dispute the fact that the Cessna was collateral for the 1190 note.

the Cessna was a manifestation of its intent to retain the goods pursuant to AS 45.09.505(b). If it was, both debts were satisfied. Under *Moran v. Holman*, 514 P.2d 817 (Alaska 1973), UBA's failure to give NAR–PC notice of its intent to retain the plane would not prevent NAR–PC from proving that UBA in fact intended to retain the plane.

If the court concludes that UBA did not intend to retain the Cessna, it should also consider the trial testimony concerning the deterioration of the plane's condition while in UBA's possession, as a claim by NAR–PC against UBA for breach of UBA's duty to exercise reasonable care of the collateral in its possession. AS 45.09.207. While such a claim would not destroy UBA's security interest in the Cessna, it would result in UBA being found liable to NAR–PC for any reduction in value of the Cessna caused by UBA's unreasonable care.

AFFIRMED in part, REVERSED and REMANDED in part.

MATTHEWS and MOORE, JJ., not participating.