POWER CONSTRUCTORS,
INC., Appellant and
Cross–Appellee,

v.

TAYLOR & HINTZE, Robert G. Taylor,
Robert G. Taylor, P.S., John R. Herrig,
William L. Hintze, Dudley Kirby Wright,
Jr., and Robert P. Owens, Appellees and
Cross–Appellants.

Nos. S–7033, S–7123 and S–7124.

Supreme Court of Alaska.

June 19, 1998.

**24**

Hal P. Gazaway, Anchorage, for Appellant and Cross–Appellee.

Paul L. Davis, Anchorage, for Appellees and Cross–Appellants, Robert G. Taylor and Robert G. Taylor, P.S.

Leroy J. Barker and Julia B. Bockmon, Robertson, Monagle & Eastaugh for Appellees and Cross–Appellants Taylor & Hintze, William L. Hintze, John R. Herrig, Dudley Kirby Wright, Jr., and Robert P. Owens.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH and BRYNER, JJ.

BRYNER, Justice.

## I. INTRODUCTION

A four-million-dollar powerline construction project gone awry spawned two generations of litigation. The first, a suit by the general contractor, Power Constructors, Inc. (PCI), against the project engineer and project designer, languished in court for three years, died for lack of prosecution, and was laid to rest in *Power Constructors, Inc. v. Acres American*, 811 P.2d 1052 (Alaska 1991). The second, a legal malpractice action by PCI against its former attorneys, matured to a jury verdict for PCI that the trial court found less favorable than the defendants' pretrial offer of judgment. All parties challenge the resulting judgment. The controversy centers on PCI's proof of damages and the trial court's valuation of the actual judgment in comparison to the offer of judgment. We affirm the trial court's rulings on these central issues but remand for recalculation of prejudgment interest.

## II. FACTS AND PROCEEDINGS

### A. The Powerline Construction Project

In 1984 PCI entered into a contract with the City of Seward (City) to build an electrical line and substation near Moose Pass for the sum of $4,327,290. Construction was slated to take seven months, beginning in January 1985 and ending by July 1. PCI finished the project approximately four months late and substantially over budget. Upon completion, PCI prepared and submitted to the City a close-out request for reimbursement of additional costs totaling $2,484,000. Pursuant to the terms of their contract, PCI and the City entered into arbitration and reached an eventual settlement in which the City paid $1,161,325 and assigned to PCI its existing claims against various parties involved in the powerline project, including project engineer Acres/Hascomb, JV (A/H), and project designer Ebasco Services, Inc. (Ebasco).

### B. PCI's Original Action against A/H and Ebasco

In November 1986 PCI, in its own right and as the assignee of the City's rights, filed a superior court action through the law firm of Groh Eggers & Price against A/H and Ebasco. The complaint alleged breach of contract, misrepresentation, and negligence by both defendants and sought damages in excess of $1,000,000. Particularly relevant for purposes of this appeal is PCI's complaint against A/H, which focused primarily on alleged negligence and misrepresentations by A/H relating to the availability of poles for the powerline project. The heart of PCI's theory was that A/H was responsible for a late, inadequate and out-of-sequence delivery of powerline poles, causing extensive delay and forcing PCI to absorb substantial costs

beyond those reflected in its bid on the project.

For more than eighteen months after PCI filed its complaint, its case against A/H and Ebasco remained largely dormant. On June 8, 1988, PCI retained the firm of Taylor & Hintze to substitute for Groh Eggers & Price. A week later, the court sent the parties notice to show cause why the case should not be dismissed pursuant to Alaska Civil Rule 41(e) for lack of prosecution. Taylor & Hintze responded to this notice, advising that the firm had just entered its appearance and requesting additional time to become familiar with the case. The trial court vacated its notice of dismissal and allowed the case to continue.

On November 9, 1989, after PCI's case lapsed into an additional seventeen months of procedural inactivity, the superior court issued another notice of proposed dismissal for lack of prosecution. On December 29, 1989, the superior court dismissed the suit with prejudice. In May 1991, this court affirmed the dismissal, observing that PCI might have "recourse to a professional malpractice action against counsel." *Power Constructors*, 811 P.2d at 1056.

### C. PCI's Legal Malpractice Action

#### 1. Pretrial proceedings

Several months later, PCI filed suit against a number of Taylor & Hintze attorneys and against the firm itself (collectively, TH), alleging negligent acts and omissions in TH's handling of PCI's suit against A/H and Ebasco. PCI later amended its complaint to include claims for breach of contract, warranties, and various fiduciary duties, as well as gross negligence; PCI requested punitive damages.

On February 4, 1994, TH made an offer of judgment for a total of one million dollars. PCI did not accept this offer.

Prior to trial TH moved for partial summary judgment on the issue of punitive damages; the motion was granted, and PCI's punitive damage claim stricken. TH moved to bar PCI from relying on the "total cost method" of proving damages on its original powerline construction project claims against A/H and Ebasco. The court granted the motion, directing that PCI rely on the "actual cost method."

TH also moved to preclude admission of any evidence concerning a November 29, 1989, memorandum written to the City of Seward by TH attorney Robert Owens, in which Owens estimated PCI's damages in the underlying case at $5,041,134. For its part, PCI moved to estop TH from denying that PCI had suffered the amount of damages specified in Owens's November 29 memorandum. The trial court denied both motions, declining to estop TH from contesting the issue of damages but allowing PCI to rely on TH's memo as evidence of damages.

TH further moved for an order precluding PCI from seeking damages for the expenses PCI incurred in originally pursuing its claim for additional compensation against the City of Seward; TH likewise moved to bar PCI from seeking damages for the City's expenses in defending against PCI's claim. The trial court allowed PCI to claim these expenses as damages, but only to the extent that PCI could show that the expenses directly related to construction problems attributable to A/H or Ebasco.

#### 2. Trial

PCI's case against TH proceeded to trial using the "trial-within-a-trial" approach for proof of malpractice damages. Under this approach, in order to show that TH's malpractice resulted in compensable damages, PCI was required to try the merits of its underlying case against A/H and Ebasco as part of its malpractice case against TH.

At the conclusion of PCI's evidence, and again at the conclusion of its own case, TH moved for directed verdicts on the grounds that PCI failed to prove (1) causation and damages by the actual cost method, (2) its damages with sufficient specificity, or (3) the collectibility of any judgment that PCI might have received in the underlying action. The court denied these motions, finding sufficient evidence of actual, specific, and collectible damages. At the conclusion of TH's case, PCI moved for a directed verdict on the issue

of TH's liability. The court denied this motion as well.

The jury returned a verdict for PCI in the amount of $419,905. The verdict found TH negligent and that its negligence resulted in dismissal of PCI's suit against A/H and Ebasco. On the merits of the underlying action, the jury found no negligence or misrepresentation on the part of Ebasco but found A/H liable to PCI and the City for both negligence and misrepresentation. The jury's award of $419,905 reflected its conclusion that A/H's negligence caused the City of Seward to suffer $40,000 in increased administrative costs and $136,271 in arbitration expenses, and PCI to suffer $200,000 in increased construction costs and $43,634 in arbitration expenses.[1]

### 3. *Posttrial proceedings*

Following trial PCI moved for entry of judgment, for an award of attorney's fees, and for a determination of prejudgment interest. In support of these motions, PCI submitted a proposed judgment calculating its total recovery at $1,090,000—$90,000 more than TH's pretrial offer of judgment.

The trial court subsequently rejected PCI's computations and, for purposes of comparison with TH's offer of proof, recalculated the judgment to be worth at most $895,802. Relying on this figure, the court ruled that PCI's verdict resulted in a judgment less favorable than TH's offer of judgment.

The court proceeded to fix prejudgment interest at the reduced rate of 5.5%. The court awarded attorney's fees to PCI only through the date of the offer of judgment, and, in so doing, used Civil Rule 82's partially contested (without trial) schedule. In addition, using the Rule 82 contested (trial) schedule, the court awarded attorney's fees to both the Taylor & Hintze law firm and its principal member, Robert G. Taylor (who was separately represented), from the date of their offer of judgment to the date of the verdict. The court likewise awarded both the law firm and Taylor their post-offer costs.

PCI appeals; TH cross-appeals.

### III. *PCI'S APPEAL*

#### A. *Quasi–Estoppel*

##### 1. *Standard of review*

■■■ The applicability of estoppel to a particular set of facts is a question of law subject to independent review. *See State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995). This court adopts the rule of law that is most persuasive in light of precedent, reason, and policy. *See Sopcak v. Northern Mtn. Helicopter Servs.*, 924 P.2d 1006, 1008 (Alaska 1996).

##### 2. *Discussion*

■■ In preparing for trial, TH pursued a strategy aimed at showing that PCI's original suit against A/H and Ebasco would have resulted in a verdict of no more than $115,000 and that this sum was therefore the maximum amount that PCI could claim against TH for its alleged negligence in allowing the original suit to be dismissed. Prior to trial, PCI sought a ruling estopping TH from contending that PCI's damages in the underlying suit would have been "anything less than $5,041,134.94." PCI pointed to a November 29, 1989, memorandum by TH attorney Robert Owens estimating PCI's damages in the underlying case at this amount. PCI argued that it would be unconscionable for TH to change its position in the malpractice case. The trial court denied this motion; PCI challenges the denial on appeal.

As it did below, PCI relies on *Jamison v. Consolidated Utilities, Inc.*, 576 P.2d 97, 102 (Alaska 1978), where this court stated that quasi-estoppel "precludes a party from taking a position inconsistent with one ... previously taken where circumstances render assertion of a second position unconscionable." *Jamison* set out five relevant criteria for evaluating a quasi-estoppel claim:

> Among the many considerations which may indicate that an inconsistent position is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced

---

**1.** The jury found no additional damages attribut- able to A/H's misrepresentations.

some disadvantage through the first position; the magnitude of the inconsistency; whether changed circumstances tend to justify the inconsistency; whether the inconsistency was relied on by the party claiming estoppel to his detriment; and whether the first assertion was made with full knowledge of the facts.

*Jamison*, 576 P.2d at 102–03.

Applying these criteria, we conclude that the trial court properly denied PCI's claim of quasi-estoppel. While Owens's assessment of PCI's damages was facially inconsistent with the position adopted by TH at trial, Owens's November 1989 memorandum was by its own terms a tentative, "best case scenario" estimate. The memorandum expressed numerous qualifications, explaining that it relied on PCI-supplied total cost summaries and other data, and assumed that this information could be proved at trial; it warned that PCI's cost-accounting process was "unorthodox" and subject to attack at trial; and it cautioned that "further analysis and additional discovery will be required before we can determine if any of the claimed expenses are attributable to the City [of Seward]."

The express language of the memorandum thus obviously and unmistakably reserved TH's right to change its position on the issue of PCI's damages. In light of this language, it hardly seems surprising that TH would change its position after a full opportunity to discover, analyze, and develop PCI's damages evidence in an adversarial context.

Owens's memo must also be assessed in context with other memos addressing PCI's damages that were generated by TH at approximately the same time. For example, in a memo dated September 20, 1989, TH engineer Gregg Gottgetreu (who had analyzed much of PCI's construction cost data) warned Owens of the highly contingent nature of PCI's damages evidence.[2] And in a memo dated November 9, 1989, TH attorney Rube Junes estimated PCI's "total cost claim" to be "within the range of $2.0 to $2.5 million rather than the approximate $7.0 million claim presented [by PCI]."

These circumstances make it clear that this initial position, as asserted by TH, as reflected in Owens's memo, was not based "on full knowledge of the facts," *Jamison*, 576 P.2d at 103; that the "magnitude of the inconsistency," *id.* at 102, between its original and later numerical estimates is more apparent than real; and that "changed circumstances tend to justify the inconsistency." *Id.* Moreover, PCI has failed to show how TH gained any advantage or placed PCI at any disadvantage by taking the position stated in Owens's 1989 memorandum. Nor has PCI shown any detrimental reliance.[3] Hence, the *Jamison* criteria do not support PCI's estoppel claim.[4]

---

**2.** Gottgetreu's memo to Owens stated, in relevant part:

> The net result of this cursory monetary analysis is that we may not be able to support a damage quantification assessment that would be lucrative enough for the City to pursue the claim with any vigor. *If* PCI's lost profits could be computed, and *if* perhaps business devastation could be proven and calculated, the value sought may make the City's decision to pursue Ebasco and Acres/Hanscomb easier.

**3.** To the contrary, it appears that PCI placed no reliance whatsoever on the Owens estimate. In litigating its malpractice claim against TH, PCI advanced various claims concerning the extent of the damages involved in the underlying action against A/H and Ebasco; none of those claims adopted the Owens estimate.

**4.** PCI urges us to add a sixth criterion to the *Jamison* estoppel analysis: the existence of a fiduciary relationship requiring full and fair disclosure. PCI cites only one case in support of this proposition—*Pedersen v. Zielski*, 822 P.2d 903, 909 (Alaska 1991)—which is inapposite because it addresses the fiduciary duty of "full and fair disclosure" in the context of a doctor's misrepresentation of the causes of a patient's paralysis, not in the context of quasi-estoppel. *Id.* In any event, the fiduciary relationship between TH and PCI seems largely irrelevant with respect to Owens's November 1989 memo, which was addressed to the City of Seward rather than to PCI, and was not written to disclose information to PCI but rather to provide support for TH's request that the City contribute money to fund PCI's litigation.

PCI also complains of the trial court's failure to instruct the jury that TH could be bound by the November 1989 assessment of damages. PCI cites *Clary Insurance Agency v. Doyle*, 620 P.2d 194, 201 (Alaska 1980), which states that a plaintiff is entitled to a jury instruction "consonant with the theory of her case if such enjoys evidentiary support." This rule assumes, however, that a party's theory of the case is legally tenable.

## B. *Punitive Damages*

### 1. *Standard of review*

 This court reviews superior court summary judgment orders de novo to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law on the established facts. *See Mount Juneau Enters., Inc. v. City & Borough of Juneau,* 923 P.2d 768, 772–73 (Alaska 1996). We draw all reasonable inferences of fact against the moving party and in favor of the non-moving party. *See Providence Washington Ins. Co. v. Fireman's Fund Ins. Cos.,* 778 P.2d 200, 203 (Alaska 1989).

### 2. *Discussion*

 In its complaint against TH, PCI requested an award of punitive damages. This claim was based on allegations that TH, while representing PCI in the suit against A/H and Ebasco, made active efforts to be retained as counsel by a company named Enserch, a subsidiary of Ebasco. PCI asserted that TH's efforts created a conflict of interest and amounted to "gross negligence . . . evidencing a reckless indifference" to PCI's best interests.

In granting summary judgment to TH on punitive damages, the trial court started from the premise that, in order to prevail on its claim, PCI would be required to prove the existence of a conflict before PCI's original action was dismissed—in other words, a showing of post-dismissal contacts between TH and Enserch would not suffice to trigger punitive damages. PCI did not dispute this reasoning.[5] While acknowledging that PCI had presented evidence indicating that TH made contact with Enserch and was retained

to represent that company in a matter unrelated to PCI's case after the case was dismissed, the court found that PCI had presented no evidence to substantiate its claim that TH and Enserch had engaged in social interactions beginning in the summer of 1988—several months before the dismissal. Accordingly, the court found no evidence of pre-dismissal conflict to support a claim of punitive damages.

In its opening brief, PCI cites *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* 828 P.2d 745, 760 (Alaska 1992), for the propositions that the attorney-client relationship involves a fiduciary duty and that punitive damages may be awarded when this duty is breached through conduct manifesting reckless indifference to the client's rights. PCI insists that TH's contacts with Enserch were sufficient to show this kind of reckless indifference. In advancing this argument, however, PCI does not address the trial court's pivotal finding: that PCI had failed to prove any pre-dismissal contacts at all between TH and Enserch. Our review of the record establishes that the trial court's finding was accurate when the court ruled on the punitive damages issue.

In its reply brief, PCI points for the first time to "later evidence" indicating that a TH attorney agreed to represent Enserch a month before the dismissal of PCI's original case—at about the same time the superior court issued notice of its intent to dismiss for lack of prosecution.[6] But as PCI admitted below, this evidence was not included in the trial court record when the court ruled on summary judgment, so it was not available for the court's consideration.

---

Our conclusion that TH was not estopped from taking a position on damages contrary to that expressed in Owens's memo is thus dispositive: because that theory was legally untenable, PCI was not entitled to an instruction on its theory of estoppel.

5. In fact, the trial court expressly noted PCI's agreement with this premise in its order granting TH's motion for summary judgment on punitive damages. Later, during the trial, the court confirmed PCI's position: "So the only thing that is at issue is then the pre-dismissal conduct, correct?" PCI replied in the affirmative.

6. This evidence first came to light shortly before trial, when TH, in a supplemental response to PCI's earlier interrogatories, conceded that TH's representation of Enserch began in October 1988. According to the supplemental response, the representation "did not involve litigation," but instead "involved a review of a request for equitable adjustment that was to be submitted to the United States Army Corps of Engineers" regarding construction of dining facilities at Fort Wainwright.

While the superior court is not limited to evidence expressly called to its attention by a party moving for summary judgment and should examine the entire record before ruling on the motion, *see American Restaurant Group v. Clark*, 889 P.2d 595, 598 (Alaska 1995), the court must necessarily base its decision on the record before it when it rules. The "later evidence" referred to by PCI did not join the record until shortly before trial, when PCI filed it as an exhibit in support of a motion unrelated to the previously resolved issue of punitive damages.[7] At no time thereafter did PCI call the evidence to the court's attention in connection with its punitive damages claim or seek reconsideration of the trial court's earlier summary judgment ruling on the issue.[8]

Moreover, even assuming the "later evidence" established a conflict of interest and a breach of TH's fiduciary duty to PCI, PCI has failed to allege or show that this breach had any causal connection to the dismissal of PCI's case, which resulted from an apparently unrelated eighteen-month-long period of procedural inactivity. Nor has PCI alleged or shown any other actual prejudice resulting from the alleged breach of fiduciary duty.

Finally, to the extent that the "later evidence" might support a finding of conflict of interest, that conflict would seem *de minimis*. PCI cites no convincing authority that a fiduciary breach of this kind would, standing alone, constitute reckless indifference sufficient to sustain an award of punitive damages.

We find no error in the trial court's decision striking PCI's punitive damages claim.

### C. *Jury Instructions*

#### 1. *Standard of review*

Issues involving the adequacy of jury instructions generally raise questions of law and are subject to de novo review. *See Sever v. Alaska Pulp Corp.*, 931 P.2d 354, 361

n. 11 (Alaska 1996). As long as the jury is properly instructed on the law, however, the trial court has broad discretion to determine whether to give instructions specially tailored to the case at hand. *See Buchanan v. State*, 561 P.2d 1197, 1207 (Alaska 1977). Rulings on such instructions are reviewed for abuse of discretion. *See, e.g., Stoneking v. State*, 800 P.2d 949, 951 (Alaska App.1990).

An instruction erroneously stating the law will not be grounds for reversal unless it results in actual prejudice. *See Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 114 (Alaska 1992). And an instruction that is not objected to will be reviewed only for plain error—that is, for obvious error creating a high likelihood of injustice. *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 153 (Alaska 1992).

#### 2. *Refusal to instruct on TH's spoliation of evidence*

PCI challenges the superior court's refusal to give Proposed Instruction Number 40:

> The failure of [PCI] to present evidence that supports claims it and the City of Seward had against Acres/Hanscomb and EBASCO in the underlying case, should not be construed against [PCI], if failure to present such evidence is due to the failure of defendant attorneys to preserve such evidence. To the contrary, you are instructed that in the absence of such evidence, you may construe the missing evidence in favor of [PCI].

PCI argues that the proposed instruction was warranted in light of evidence establishing that TH, while acting as PCI's counsel, failed to preserve evidence developed by key witnesses who are now deceased.

In *Sweet v. Sisters of Providence*, 895 P.2d 484, 492 (Alaska 1995), observing that "for every wrong there is a remedy," we recognized that under certain circumstances, bur-

---

7. PCI attached this evidence as Exhibit 4 to its "Opposition to Motion in Limine to Preclude Introduction of Evidence at Trial Concerning any Potential Conflict of Interest of Defendants," filed August 22, 1994. PCI points to no earlier appearance in the record of this document.

8. In fact, PCI's pretrial motion acknowledged—without stating a reason—that PCI did not intend to rely on this evidence as a ground for reconsideration of the trial court's summary judgment order striking punitive damages.

den shifting may be an appropriate remedy for an opposing party's spoliation of evidence. *See id.* (quoting *Smith v. Superior Court,* 151 Cal.App.3d 491, 198 Cal.Rptr. 829, 832 (1984)). In the present case, however, PCI's claim of entitlement to a spoliation instruction suffers from a lack of supporting facts. The evidence assertedly lost by TH was evidence developed by PCI's own employees. This evidence was apparently within PCI's control at all relevant times. PCI has not shown that the loss of this evidence resulted from TH's negligent handling of the A/H–Ebasco lawsuit.[9] Nor has PCI made a convincing showing of actual prejudice. Our review of the record persuades us that the trial court did not err in refusing to give the proposed instruction.

### 3. The "trial-within-a-trial" instruction

PCI next contends that the trial court erred in instructing the jury to apply the trial-within-a-trial approach in deciding PCI's legal malpractice claim. Jury Instruction Number 20 directed the jury "to determine what the outcome would have been if [PCI's] lawsuit against [A/H] and Ebasco Services had not been dismissed. Thus, you are hearing this case as if you were the jury in the [PCI v. A/H–Ebasco] case." The instruction required PCI to prove that it would have been successful in the underlying suit, that it would have been awarded damages,

and that the judgment would have been collectible from A/H or Ebasco.

In challenging the trial court's instruction, PCI urges us to "leave it within the discretion of the trial judge to determine the manner in which the plaintiff may proceed to prove its claim for damages." However, PCI has failed to establish that the trial court believed itself precluded from exercising discretion on the issue. Although our decisions have twice approvingly mentioned the trial-within-a-trial approach,[10] we have not expressly adopted it. Given that we have never formally embraced the approach, the trial court was not necessarily constrained to use it.

PCI cites *Lieberman v. Employers Insurance of Wausau,* 84 N.J. 325, 419 A.2d 417, 426–27 (1980), for the proposition that the trial-within-a-trial approach should not have been applied to this case. Yet *Lieberman* is readily distinguishable; there, in finding the approach improper, the court relied primarily on the reversed roles of the parties in the malpractice and underlying actions: the plaintiff in the malpractice case had been the defendant in the underlying suit. *See id.,* 419 A.2d at 426. The court in *Lieberman* stated that, if the trial-within-a-trial approach were used in those circumstances, the jury "would not obtain an accurate evidential reflection or semblance of the original action." *Id.* at 427.[11]

9. PCI advances a general allegation that TH had an obligation to preserve the evidence by promptly taking depositions and engaging in related discovery. However, PCI fails to explain why TH should have deposed PCI's own witnesses. Moreover, PCI has failed to explain why TH should be held to a superior duty of preservation than PCI itself. Well before TH entered the case, PCI had been required to assemble and organize its evidence for purposes of submitting its arbitration claim against the City.

10. In *Shaw v. State, Department of Administration,* 861 P.2d 566, 573 (Alaska 1993), we held that, to prevail in a civil action for legal malpractice allegedly occurring in a criminal case, Shaw was required to prove that the jury would have found him innocent if his attorney had performed competently. We went on to comment that, "as most civil malpractice plaintiffs, [Shaw] will have to present a 'trial within a trial.'" *Id.* In so observing, we quoted from 2 Mallen &

Smith, *Legal Malpractice* § 27.1, at 624 (3d ed.1989):

> [The elements of the legal malpractice action] are traditionally handled by having a trial within a trial, the goal of which is to determine what the result of the underlying proceeding or matter *should have been.* ... The trial judge must determine issues of law which were not previously urged or adequately decided.

*Id.* at 573 n. 12 (markings in original).

In *Diamond v. Wagstaff,* 873 P.2d 1286, 1290 n. 2 (Alaska 1994), the parties debated the desirability of adopting the trial-within-a-trial approach, but we found it unnecessary to decide the issue.

11. The proper method of proof, the court concluded, was to use expert testimony as to what as a matter of reasonable probability would have transpired at the original trial. *Id.* 419 A.2d at 427.

PCI claims that the trial-within-a-trial approach was unsuitable to this case for an entirely different reason: because "several witnesses with testimony favorable to PCI have died." PCI's argument is unpersuasive. As we have previously noted in discussing PCI's proposed spoliation instruction, PCI has failed to demonstrate that it lost any materially favorable evidence as a result of negligence by TH. Hence, the claim of lost evidence does not support PCI's argument that the trial court erred in adopting the trial-within-a-trial approach.[12]

### 4. Proof of collectibility

■ PCI further argues that the trial court erred in instructing that PCI was required to prove that "any judgment would have been collectible" from A/H or Ebasco.

■ Professional negligence consists of four elements: duty, breach, causal connection between negligent conduct and injury, and "actual loss or damage resulting from the professional's negligence." *Belland v. O.K. Lumber Co.*, 797 P.2d 638, 640 (Alaska 1990). When a legal claim is lost through professional negligence, actual damage occurs only if the claim is meritorious and has value; the plaintiff bears the burden of proving these elements of damage. *See Ridenour v. Lewis*, 121 Or.App. 416, 854 P.2d 1005, 1006 (1993). In such cases, however, it is far from clear whether proof of a lost claim's value requires evidence showing that a judgment on the lost claim would actually have been collectible.

This court has never faced the issue; authorities elsewhere are divided. *See generally Jourdain v. Dineen*, 527 A.2d 1304, 1306 (Me.1987). Some decisions hold that "collectibility of the [underlying] judgment is an element of proof in a legal malpractice action and that the burden is ... placed on the plaintiff to prove collectibility." *Id.* at 1306.[13] Others, like *Jourdain* itself, adopt a contrary view. *See id.* at 1307 ("uncollectibility of a judgment should be treated as a matter constituting an avoidance or mitigation of the consequences of one's negligent act").[14]

Recently, in *Kituskie v. Corbman*, 452 Pa.Super. 467, 682 A.2d 378, 382 (1996), *appeal granted in part*, 548 Pa. 628, 693 A.2d 967 (1997), the Pennsylvania Supreme Court concluded that, when legal malpractice results in the loss of a meritorious claim, the malpracticing attorney should bear the burden of disproving collectibility. In reaching this decision, the court reasoned that "the plaintiff should not have the added burden ... since he or she has already been allegedly wronged by two parties (the third party and the attorney)." *Id.*

We find *Kituskie* persuasive. Because the need to determine collectibility is caused by professional negligence, and the requirement of proving collectibility arises only after malpractice has been proved,[15] policy would seem to militate in favor of requiring the malpracticing attorney to bear the inherent risks and uncertainties of proving uncollectibility. Practicality seems to point to the same conclusion: there is no good reason to presume from a record silent on the issue of

---

12. PCI also cites *Native Alaskan Reclamation and Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1223 (Alaska 1984), in support of its challenge to the trial-within-a-trial method. That case, however, is inapposite, since it merely recognizes that trial courts have discretion to require a "lesser degree of certainty" in proof of damages when the wilful nature of a breach of contract prejudices the non-breaching party's ability to prove damages. *See id.* (citing *Restatement (Second) of Contracts* § 352 cmt. a (1981)).

13. *See, e.g., McDow v. Dixon*, 138 Ga.App. 338, 226 S.E.2d 145, 147 n. 2 (1976); *Taylor Oil Co. v. Weisensee*, 334 N.W.2d 27, 29 (S.D.1983); *Tilly v. Doe*, 49 Wash.App. 727, 746 P.2d 323, 326 (1987).

14. *See also Tydeman v. Flaherty*, 126 Or.App. 180, 868 P.2d 755, 758 (1994); *Springer v. Haugeberg, Rueter, Stone & Gowell, P.C.*, 124 Or.App. 2, 860 P.2d 912, 914 (1993); *Ridenour v. Lewis*, 121 Or.App. 416, 854 P.2d 1005, 1006 (1993).

15. The issue of collectibility poses singular problems in the context of legal malpractice cases, for the actual value of the underlying judgment—whether awarded or lost—becomes the determining measure of the primary judgment against the negligent attorney. It is this need to fix the actual value of the underlying judgment that places collectibility in issue. The issue arises only once malpractice is established.

collectibility that the underlying judgment at issue would not eventually be collected.[16]

■ We thus adopt the rule imposing upon defendants the burden of proving uncollectibility. Accordingly, we conclude that the trial court erred in instructing the jury that PCI bore the burden of proving collectibility. But the error does not require reversal. Here, by awarding damages to PCI, the jury necessarily found that PCI had met its burden of proving collectibility.[17] Accordingly, the error did not result in actual prejudice and was therefore harmless. *See Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 114 (Alaska 1992).

### 5. *Impromptu change in instructions on nondisclosure*

PCI's next argument arises from the trial court's impromptu decision to amend jury instructions dealing with the elements of PCI's misrepresentation and nondisclosure claims against A/H in the underlying breach of contract action. To explain our resolution of this argument, we must describe the factual context in which it arose.

■ During pre-final-argument discussions on instructions, PCI asked the trial court to instruct the jury on PCI's claims in the underlying case that A/H had misrepresented and failed to disclose material facts to both PCI and the City. The court agreed to instruct on misrepresentation and nondisclosure as to the City and on misrepresentation as to PCI, but questioned the legal basis for an instruction on the claim that A/H had failed to disclose facts to PCI. The court reasoned that, because an action for nondisclosure presupposes a contractual duty to

disclose, and because A/H's contract in the underlying case was with the City rather than PCI, PCI's nondisclosure claim could apply only as between A/H and the City. PCI pointed out, however, that A/H had acted as the City's agent in dealing with PCI on the construction project and had thus inherited the City's contractual duty of disclosure toward PCI. The court accepted this argument and agreed to instruct on PCI's theories that A/H had misrepresented and failed to disclose material facts to both the City and PCI.

A day later, however, as the court read the instructions to the jury after the parties' final arguments, the scope of PCI's nondisclosure claim became confused. PCI had apparently neglected to delete extraneous language from the final form of two instructions that immediately preceded the instructions on misrepresentation and nondisclosure. As the court read these instructions to the jury, it caught the errors and corrected them by blacking out the extraneous language and instructing the jury to disregard the blackouts. The court then began reading aloud the next instructions, which dealt with misrepresentation and nondisclosure. Apparently distracted by the mistakes it had just corrected, and evidently recalling its earlier concern over the scope of PCI's nondisclosure claim but failing to recall the previous day's discussions on the topic, the court erroneously assumed that the nondisclosure instruction's references to A/H's failure to disclose facts to PCI were also mistaken:

[Court reading to the jury]: Power Constructors claims that it was damaged because of Acres/Hanscomb's—because Acres/ Hanscomb failed to disclose certain information. In order to win on this claim

---

16. *See, e.g., Ridenour,* 854 P.2d at 1006 ("A judgment may have value because it is collectible from the judgment debtor's assets or prospective assets, or because the judgment debtor's insurance partly or wholly covers the claim. A judgment may also have market value as an assignable property interest.").

17. We find no reasonable possibility that the jury's limited award of damages to PCI reflects a finding of partial collectibility. TH's defense at trial centered on the contention that PCI had failed to prove the causation and amount of the losses it claimed to have sustained during the powerline construction project. PCI's evidence

of collectibility suggested that both Ebasco and A/H had been insured. Neither this evidence nor any other that the parties have called to our attention could have provided the jury a logical basis for finding that a judgment against A/H or Ebasco would have been only partially collectible. The jury's express finding of no misrepresentation or negligence by Ebasco is logically unrelated to the issue of collectibility. Furthermore, PCI has not argued that the error in instructing on collectibility might have led the jury to find that part, but not all, of PCI's damages against A/H were collectible.

Power Constructors must establish that it is more likely true than not true that, one, Acres/Hanscomb failed to disclose information to Power Constructors—

[Court addressing counsel]: Counsel, please approach. . . .

After a brief conference at the bench, the court excused the jury, discussed the matter with the attorneys, and proposed to delete all references to A/H's duty to disclose information to PCI. Despite the previous day's discussions, PCI's counsel expressly agreed with the proposal:

[Court]: [I]t's my understanding that what was decided yesterday in fixing that instruction was that the ... failure to disclose theory, was the City of Seward's ... theory because of the contractual relationship it had with [A/H]. However, this entire instruction is done as if it were [A/H that] had a contract with [PCI] and it was their claim. And so I think we just clarified at the bench it should be City of Seward, correct?

[PCI's counsel]: That's correct.

The court proceeded to make the changes, asking item by item if counsel agreed with its rewording of the instructions. PCI's counsel repeatedly and consistently agreed. As changed, the instruction limited PCI's nondisclosure claim to A/H's failure to disclose information to the City.

Upon completing the revision, the court called back the jury, apologized for the inconvenience, explained that the need to modify the instructions "is my fault," and read aloud the remainder of the instructions, including the newly modified instructions on nondisclo-sure. After allowing the jury to retire for deliberations, but before sending it the written jury instructions, the court again asked the parties if they had "anything else regarding jury instructions." PCI's counsel replied, "No, Your Honor."

Late the next day, PCI filed a motion challenging the revised nondisclosure instructions and asserting its earlier claim that A/H had failed to disclose information to PCI. PCI asked for curative instructions or, alternatively, a mistrial. By then, the court had received word that the jury had reached a verdict. The court convened the parties and, as a potential curative measure, suggested sending the jury a copy of the original nondisclosure instructions and an amended verdict form, together with a note advising the jury that the confusion over the instructions was the court's fault, not counsel's.

Counsel for TH objected vigorously, contending that PCI's counsel had waived any objection by agreeing to the previous day's last-minute revisions. The court then asked PCI's counsel why he had failed to object. Counsel replied that "[t]he whole thing caught me off guard." When reminded by the court that he had expressly agreed to various revisions, and when pressed to explain why, counsel demurred, asserting that he did not specifically recall agreeing to any revisions. The court was unpersuaded. Noting that PCI had waited more than twenty-four hours to assert its changed position, during which time the jury had completed its deliberations, the court concluded that no curative measures were warranted.[18] The jury was called in, and returned its verdict.

---

18. In relevant part, the court stated:

[W]hat I recall happened is that I indicated 'Isn't this supposed to be the City of Seward's claim based on the contractual relationship and that special relationship to disclose,' and what I recall everybody saying at the bench was yes. . . . [S]o I excused the jury. I'm quite certain that I didn't do anything at that point to give any indication to the jury that it was anybody's, quote, fault. . . . When we excused the jury we went through and I believe the record will be clear that as we went through there was an agreement by Mr. Gazaway [PCI's counsel] that in fact, yes, this was the City of Seward's claim for nondisclosure. So this isn't a matter of wording in an instruc-tion, this is a matter of whose claim is it, is it the City of Seward's claim or is it the City of Seward and PCI's claim. . . . Everybody agreed to the redaction and then I brought the jury back, and reread the instruction. To the extent that there was a problem, it could've been brought up then. To the extent it was a problem even after then, that jury went out at 3:00 o'clock or 3:30, I think, 3:20, it's now 20 of five [the next day] and we got this filed in our chambers somewhere in the 4:00 o'clock today range, so it's been 24 hours. So to the extent there was truly a concern, this could've been handled in a teleconference, it could've been handled in some way other than at 4:00 o'clock after we have a jury verdict[,] this is

PCI now claims that it was prejudiced by the court's decision to change the instructions in the jury's presence, after closing arguments had been completed. According to PCI, the court's action amounted to a violation of Alaska Civil Rule 51(a).[19] In our view, however, PCI has waived this argument by expressly endorsing the modified instructions that were read to the jury. *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 152 n. 6, 153 (Alaska 1992).[20]

Nor has PCI established plain error. PCI did not claim below that the revised instruction caused it prejudice by undercutting any position asserted by its counsel in final argument. *Cf. Rollins v. State*, 757 P.2d 601 (Alaska App.1988). It advances this claim on appeal, but fails to substantiate it.[21] PCI also argues that the trial court handled the matter in a manner that was likely to prejudice the jury against it. But the record belies this claim: it establishes that the trial court assumed all blame and did nothing to disparage the parties.

█ More significant, it appears that the complained-of error had no actual effect on the verdict. PCI's claims of nondisclosure were intrinsically tied to its claims of misrepresentation. And although the jury found that A/H had injured PCI by a misrepresentation, it awarded no compensation for this injury beyond the amount it awarded for A/H's negligence. Given these circumstances, the possibility of an incremental award of damages based on a finding of

nondisclosure seems virtually nil. We find no reversible error on this point.

### D. *Value of Verdict in Comparison to Offer of Judgment*

#### 1. *Standard of review*

█ Calculation of the value of a verdict to determine if it exceeded an offer of judgment presents questions of law, which we review de novo. *See Pratt & Whitney Canada, Inc. v. Sheehan*, 852 P.2d 1173, 1182 n. 13 (Alaska 1993).

#### 2. *Prejudgment interest and attorney's fees on the underlying claim*

For purposes of comparing the value of PCI's $419,905 verdict with the value of TH's million-dollar pretrial offer of judgment, the trial court made a single award of prejudgment interest; the interest ran from December 18, 1985—the date on which PCI submitted its cost overrun claim to the City of Seward—to February 4, 1994—the date of TH's offer of judgment. PCI claims error, contending that two awards of prejudgment interest should have been calculated—one for the underlying claim against A/H and one for the malpractice claim against TH.

PCI asserts that the court should first have calculated a total value for its underlying claim against A/H by awarding prejudgment interest from the accrual date of PCI's original cause of action against A/H to the accrual date of its malpractice claim against TH (that is, the date the court dismissed

---

brought to our office, apparently without service on the Defendants.

**19.** Civil Rule 51 states, in relevant part: "The court shall inform counsel of the final form of jury instructions prior to their arguments to the jury." We note that PCI's reliance on this rule appears misguided, since the court did in fact inform the parties prior to their arguments of the instructions it intended to give and obtained the parties' approval. In undertaking a midstream revision of the instructions, the court merely attempted to conform the instructions to its recollection of the agreed-upon version. The resulting error was one of faulty recollection, not failure to inform, as required under the rule. This case is thus readily distinguishable from *Methodist Hospitals of Dallas v. Corporate Communicators, Inc.*, 806 S.W.2d 879, 883 (Tex.App.1991),

which PCI cites in support of its Rule 51 argument.

**20.** Moreover, PCI has yet to offer any explanation for its 24–hour delay in reasserting its original position—a delay that effectively precluded any meaningful corrective action because it occurred while the jury deliberated the case and decided on a verdict. Even assuming that PCI's endorsement of the modified instruction could be explained as an understandable consequence of being "caught off guard," its claim of error would be foreclosed by this unexplained failure to call the issue to the court's attention in a timely manner.

**21.** Indeed, PCI has failed to designate for the record a transcript of its final argument to the jury.

PCI's original case against A/H), and adding this award—together with an appropriate award of prevailing-party costs and attorney's fees—to the principal amount of PCI's recovery against A/H, as found by the jury. In PCI's view, the court should then have awarded prejudgment interest on the total value of the underlying judgment from the date PCI's malpractice cause of action accrued until the date of the offer of judgment.[22]

◼◼◼◼ PCI's argument has merit. We have long recognized that the purpose of prejudgment interest is to compensate the injured party for the time it has been less than whole. *See Davis v. Chism*, 513 P.2d 475, 481 (Alaska 1973). Since prejudgment interest is a form of consequential damages, *see Farnsworth v. Steiner*, 638 P.2d 181, 184 (Alaska 1981), an award of prejudgment interest becomes a part of the judgment proper. *See Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin*, 828 P.2d 745, 759 (Alaska 1992).

Two judgments are at issue in a legal malpractice case, the judgment in the underlying cause affected by the malpractice and the judgment sought against the attorney for malpractice. In *Bohna*, we recognized that the value of each of these judgments must be separately considered when the trial court determines whether a jury award for malpractice exceeds a pretrial offer of judgment. *See id.* Since the malpractice award compensates for the loss of a favorable judgment or the entry of an unfavorable one, the total value of the lost or unfavorable judgment must first be established; this entails calculation of prejudgment interest and attorney's fees on that judgment. *See id.* Costs and attorney's fees in the malpractice case must then be based on the underlying judgment's total value. *See id.*

◼◼◼ TH seeks to distinguish *Bohna* because it was not a lost-claim case: the plaintiff in the malpractice action in *Bohna* had been held liable in the underlying action, and

a judgment had actually been entered against him. *See id.* at 751. TH contends that the circumstances here are different, since no judgment was ever entered on PCI's lost claim against A/H. TH reasons that, because it is impossible to determine the date a final judgment would have been rendered in the underlying suit, prejudgment interest should not have been added to the fictitious judgment.

This claim of uncertainty is more illusory than real. TH's negligence caused PCI to lose its claim against A/H. This loss constitutes PCI's injury in the malpractice case. The loss occurred when the superior court dismissed the underlying cause. It follows that the value of the underlying cause must be determined as of the date of the dismissal. Since the purpose of the malpractice award is to restore PCI as closely as possible to its position on the date of loss,[23] prejudgment interest accrued as of that date is properly included in the total value of the underlying recovery. *See Bohna*, 828 P.2d at 759. On the same date, PCI's malpractice action against TH accrued, thereby triggering accrual of prejudgment interest on the second cause.

◼◼◼ PCI also claims that $44,495 should have been added to the total judgment on the underlying case to reflect attorney's fees it would have received under Civil Rule 82 as a prevailing party against A/H. While the addition of these fees might have been appropriate had PCI's underlying claim been against A/H alone, PCI also proceeded against Ebasco in the underlying case, and it did not prevail against Ebasco. This added a twist to the attorney's fees issue in the underlying case, for, as the trial court correctly recognized:

> It would be logically inconsistent in determining the total loss to plaintiffs due to dismissal of the lawsuit to allow plaintiff to recover for attorney's fees as prevailing party against [A/H] in the underlying suit without deducting the amount which it

---

22. Although the trial court rejected it as "an improper double award," this approach would merely have compounded prejudgment interest on the date that PCI lost its underlying cause of action and accrued its malpractice claim.

23. *Cf. Beaulieu v. Elliott,* 434 P.2d 665, 670–71 (Alaska 1967) (valuing future income at present worth).

would have had to pay to Ebasco as a prevailing party in the underlying suit.

The trial court noted that Ebasco undoubtedly would have been awarded prevailing-party fees. Finding that Ebasco's fees against PCI actually might have exceeded PCI's fees against A/H, the court treated the overall outcome of the attorney's fees issue as a "wash" and declined either to add prevailing-party attorney's fees to the underlying judgment to reflect PCI's recovery against A/H or to deduct fees from the judgment to reflect Ebasco's entitlement to a recovery against PCI.

In our view, the trial court's analysis of the attorney's fee issue is sensible and supportable. The court correctly determined that Ebasco would have been entitled to prevailing-party fees. *See Myers v. Snow White Cleaners & Linen*, 770 P.2d 750, 753 (Alaska 1989). Recognizing and providing for this award in the calculation of the total underlying judgment entails no more uncertainty than recognizing and providing for the award of fees PCI would have recovered against A/H. And given the breadth of trial court discretion in fixing reasonable fees under Civil Rule 82, we find no basis for concluding that the trial court abused its discretion in treating the opposing fee awards as a "wash."

In sum, the trial court erred in failing to allocate prejudgment interest separately to each judgment; the error will necessitate recalculation of the awards in both the underlying and malpractice actions.[24] The trial court did not abuse its discretion in failing to add prevailing-party attorney's fees to the underlying judgment.

### 3. Commencement of prejudgment interest

■ PCI separately challenges the trial court's determination setting December 18, 1985, as the date that prejudgment interest began to accrue. On that date, PCI submitted its cost-overrun claim to the City of Seward. PCI claims that the date should properly have been January 7, 1985, the date it first incurred damages from A/H's misrepresentations.

■ Damages normally carry interest from the time a cause of action accrues. *See State v. Phillips*, 470 P.2d 266, 274 (Alaska 1970). "A cause of action for misrepresentation in a business transaction is complete when the injured person has ... suffered pecuniary loss or has incurred liability as a result of a misrepresentation." *Austin v. Fulton Ins. Co.*, 444 P.2d 536, 539 (Alaska 1968) (citing *Restatement of Torts* § 899 cmt. c (1939)).

In the present case, the record provides no clear indication of the date when PCI first suffered pecuniary loss resulting from A/H's negligence and misrepresentation. Construction of the powerline occurred over many months, and PCI incurred costs over the entire period of construction. PCI's attempts to link specific cost increases to specific acts of negligence or misrepresentation were imprecise, and the submission of its overrun claim marked the first point at which its construction-related losses were clearly shown to have been incurred. The construction-related damages awarded by the jury were pegged to no particular event or expenditure. And a major part of the jury verdict covered the City's and PCI's arbitration expenses, which accrued after the construction project was completed. Under these circumstances, trying to determine exactly when PCI actually suffered the losses that the jury found compensable would be a futile endeavor.

We are not persuaded that the trial court erred in selecting the date of PCI's cost-overrun claim as the date of commencement for prejudgment interest.

### 4. Rate of interest

■ The trial court began its prejudgment-interest calculation by applying the normal statutory rate of 10.5%. *See* former AS 09.30.070(a).[25] PCI contends that the

---

24. This adjustment will not increase the value of PCI's total award above TH's million-dollar offer of judgment.

25. AS 09.30.070(a) was amended to tie the rate of interest on judgments in Alaska's courts to that of the "12th Federal Reserve District discount rate in effect on January 2" of the year the

court should instead have applied interest at 11.5%. PCI asserts that during the powerline construction project, as a result of A/H's negligence and misrepresentations, it was forced to borrow two million dollars from Alaska Mutual Bank at 11.5% for "operations." According to PCI, its rate for prejudgment interest should have been fixed at the rate it actually paid to Alaska Mutual.

In support of this argument, PCI cites *Tookalook Sales & Service v. McGahan,* 846 P.2d 127, 130 (Alaska 1993). *Tookalook* is not entirely on point. *Tookalook* establishes that an aggrieved party who is forced to borrow funds may pursue and receive a compensatory damages award that includes the interest actually paid for the loan; in such cases, however, to avoid double recovery, the borrower is barred from claiming prejudgment interest on the compensatory interest award. *See id., Tookalook* thus gives borrowers in these circumstances an option: they may seek actual interest from the jury as damages or statutory interest from the court as prejudgment interest.

Here, in presenting its underlying case against A/H and Ebasco to the jury, PCI chose not to claim the Alaska Mutual loan or the interest thereon as items of damage; the jury's damage award did not include these items. Having bypassed that option, PCI's remaining recourse was to seek prejudgment interest from the court, at the rate prescribed by law; this it did.[26] We find no error.

### 5. *Commencement date for interest rate reduction*

 Under former Rule 68(b)(1) and former AS 09.30.065(1),[27] the normal statutory rate for prejudgment interest is reduced by

5% per year when a party's award of damages proves less favorable than an offer of judgment. After determining that PCI's jury verdict was less favorable than TH's pretrial offer of judgment, the trial court reduced the rate on PCI's prejudgment interest award from 10.5% to 5.5%. Because the trial court did not separately calculate prejudgment interest for the malpractice and underlying claims, however, its reduction of the prejudgment interest award reached back to December 18, 1985—the accrual date for prejudgment interest on the underlying claim. PCI claims error: "Neither Rule 68 nor A.S. 09.30.065 clearly address[es] a malpractice action" where part of the damages would be the prejudgment interest on the loss from the underlying action.

This argument has merit. As we have previously indicated, prejudgment interest on the underlying claim in a legal malpractice action becomes part of the underlying judgment; as such, it stands apart from interest awarded on the judgment for the malpractice claim. Within the malpractice case, the interest component of the underlying judgment is part of the principal upon which interest is awarded. It follows that a reduction of interest under former Rule 68(b)(1) and former AS 09.30.065 should reach back only to the accrual of the malpractice claim. On remand, the trial court should recalculate the reduction accordingly.

### 6. *Offer of judgment's costs component*

 TH's offer of judgment was "inclusive of all costs (including court awarded attorney's fees and prejudgment interest)[.]" PCI claims that the offer to pay "all costs" should be taken to mean "the entire amount of the costs incurred" by PCI, whether or not

judgment is entered. However, the amended section applies only to causes of action "accruing on or after August 7, 1997." Ch. 26 § 55, SLA 1997. Therefore, the former version of AS 09.30.070(a), which was in effect when PCI's cause of action accrued, governs.

26. In any event, PCI failed to establish that its Alaska Mutual loan was brought about by its contractual difficulties on the Seward powerline project. According to PCI president Ralph Hixon, none of the loan proceeds were put into the powerline project; the "primary part" of the

loan went to "our North Slope operation and the camp and stuff there."

27. AS 09.30.065 was amended substantially in 1997; however, the amended section applies to causes of action "accruing on or after August 7, 1997." Ch. 26, § 55, SLA 1997. Similarly Rule 68 was amended in 1997 with only prospective application. *See* Alaska Supreme Court Order No. 1281 (effective August 7, 1997). Therefore, the former versions of AS 09.30.065 and Rule 68, which were in effect when PCI's cause of action accrued, govern.

taxable under Civil Rule 79. PCI goes on to assert that the "all costs" provision has significance in assessing the relative values of the offer of judgment and the actual judgment, since the actual judgment incorporates only properly taxable costs. PCI thus argues that, for comparison purposes, the actual judgment should have been increased by an amount reflecting untaxable costs that TH ostensibly would have paid had PCI accepted the offer of judgment. In our view, however, this argument proceeds from a strained and untenable reading of the offer's "all costs" language. The trial court did not err in rejecting the argument.

### 7. *Effect of miscalculations on offer of judgment*

Advancing an "appropriate calculation" of value adjusted to reflect all of its claims of miscalculation, PCI argues that the total judgment resulting from its jury verdict is worth $1,084,458. Because this amount exceeds the million-dollar pretrial offer of judgment, PCI proposes that the trial court erred in treating the offer as superior. This argument is governed by our rejection of most of PCI's miscalculation claims. The limited points on which we have found error will not affect the overall comparison.

### E. *Attorney's Fees*

### 1. *Standard of review*

An award of attorney's fees under Civil Rule 82 will be overturned only when it is manifestly unreasonable. *See Feichtinger v. Conant,* 893 P.2d 1266, 1268 (Alaska 1995). The same standard applies to an award of fees under Rule 68, which governs offers of judgment. *See Hayes v. Xerox Corp.,* 718 P.2d 929, 938 (Alaska 1986). It is primarily for the trial court to decide whether and to what extent multiple representation is reasonable and should be compensated. *See Integrated Resources Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 304 (Alaska 1990). In determining whether the trial court's decision to compensate multiple attorneys is manifestly unreasonable, we consider a variety of relevant factors, including whether differing legal theories are present, whether one aspect of the litigation re-

quires independent counsel, and whether the trial court granted substantially less than actual billings. *See id.*

### 2. *Award of fees for two sets of attorneys*

PCI filed its malpractice action against the law firm of Taylor & Hintze and against various individual members of the firm, one of whom was Robert G. Taylor. Two law firms entered appearances for the defendants: Taylor & Hintze and all individual members except Taylor were represented by one firm; Taylor had separate counsel. All defendants joined in TH's pretrial offer of judgment. Because their offer proved more favorable than PCI's verdict, they were entitled to an award of post-offer prevailing-party attorney's fees calculated under Civil Rule 82. Former Alaska R. Civ. P. 68(b)(1). Applying Rule 82's "contested with trial" schedule, the trial court awarded defendants 30% of their actual attorney's fees from the date of the offer of judgment through trial; the fee award covered billings submitted by both sets of defense counsel, totaling $143,-397 to TH and $144,489 to Taylor.

PCI challenges the dual attorney's fee award on numerous grounds: (1) Taylor and TH asserted "virtually identical" defenses; (2) TH and Taylor were a single "party" under Civil Rule 68(b)(1); (3) the award of double fees amounted to a windfall for defendants' malpractice insurer and was inequitable because PCI "had to litigate against an insurance carrier which spent 2 million dollars contesting the amount of plaintiff's damages"; (4) the dual award covered fees that both counsel had not actually needed to incur; and (5) the award deprived PCI of access to the courts as guaranteed by the constitutional rights of equal protection and due process.

These arguments are meritless. PCI's suit named a law firm and six individual attorneys as defendants in a malpractice claim arising from the dismissal of a sizable and complex breach of contract action. Taylor and TH asserted substantially different positions: TH admitted liability and disputed only damages; Taylor denied liability. An

affidavit submitted by TH's counsel declared that "[counsel for Taylor] and [I] made every effort to minimize expense and duplication. We coordinated our efforts on motion work, deposition preparation and trial preparation to the extent possible."

The trial court found this affidavit credible, concluding that the fees incurred after the offer of judgment by each firm were "reasonable and necessary," and that the lead attorneys for the co-defendants "made every effort to minimize expense and duplication and coordinated their efforts on motion work, deposition preparation and trial preparation to the greatest extent possible." The court further found that "all of the hourly rates charged by the various attorneys and paralegals are reasonable."

PCI has failed to show that these findings are manifestly unreasonable. *See Integrated Resources Equity Corp.*, 799 P.2d at 304; *Conant*, 893 P.2d at 1268. Nor has PCI shown that they are beyond the contemplated scope of the offer-of-judgment rule [28] or are otherwise oppressive.

The purpose of Rule 68 is to encourage settlement and to avoid protracted litigation. *See Continental Ins. Co. v. U.S. Fidelity & Guar. Co.*, 552 P.2d 1122, 1125–26 (Alaska 1976). The joint offer of judgment "clearly indicated all claims between the parties would be resolved if the offer were accepted," *Taylor Constr. Serv., Inc. v. URS Co.*, 758 P.2d 99, 102 (Alaska 1988), and unequivocally put PCI on notice that, "in failing to accept the offer, [PCI] assumed the risk of the penalty." *Id.* A sizable and experienced company, PCI assumed this risk with open eyes. The trial court's fee decision is not manifestly unreasonable.

## IV. *TH's CROSS–APPEAL*

### A. *Arbitration Expenses as Damages*

#### 1. *Standard of review*

■ We ordinarily review trial court rulings on evidentiary issues for abuse of discretion. *See Landers v. Municipality of Anchorage*, 915 P.2d 614, 616 n. 1 (Alaska 1996). However, when the question is whether the trial court applied the correct legal standard in its ruling, the question presented is one of law, *see id.*, which we review de novo. *See Sopcak v. Northern Mtn. Helicopter Servs.*, 924 P.2d 1006, 1008 (Alaska 1996).

#### 2. *Discussion*

■ At trial, PCI sought to recover around $660,000 in arbitration expenses. A portion of this sum represented expenses PCI incurred in preparing its own construction claims for arbitration with the City; the balance represented expenses incurred by the City in negotiating and preparing for arbitration with PCI, which PCI claimed as assignee of the City's rights. Over TH's objection, the trial court allowed PCI to pursue its claims for arbitration expenses. However, the court specified that PCI would be limited to presenting evidence of "expenses that directly relate to extra costs actually caused by [A/H] or Ebasco *prior to* the settlement between [PCI and the City]." The jury ultimately awarded $43,634 for arbitration expenses sustained by PCI as a result of A/H's negligence and $136,271 for arbitration expenses similarly sustained by the City.

TH acknowledges that PCI was entitled to recover for any proven arbitration expenses incurred by the City as a result of A/H's negligence. However, TH claims that PCI was not entitled to recover its own arbitration expenses, since they were in essence costs incurred by PCI in developing and preserving its claim against A/H. Recovery of such costs, in TH's view, is barred under *Curt's Trucking Co. v. City of Anchorage*, 578 P.2d 975 (Alaska 1978).

PCI counters that the arbitration expenses it recovered were not incurred in asserting or protecting a direct claim against A/H, but were instead incurred in a separate proceeding forseeably resulting from A/H's

---

28. PCI cites *Greiner v. Zinker*, 573 S.W.2d 884, 885 (Tex.Civ.App.1978), and *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 918 (Tex.1979), as support for its claim that Civil Rule 68(b)(1)'s reference to "party" refers to all defendants collectively, thus precluding an award of fees to two sets of defense counsel. The cited cases are inapposite, however, since they interpret "party" for purposes of allocating peremptory challenges in jury selection.

negligence and misrepresentations. Such recovery, asserts PCI, is allowed under *Transamerica Title Insurance v. Ramsey*, 507 P.2d 492 (Alaska 1973).

In *Curt's Trucking*, 578 P.2d at 981, we recognized that expenses incurred in protecting, developing, or asserting a claim against a party who has inflicted tortious harm are ordinarily not recoverable as damages in an action against the party who inflicted the harm.[29] By contrast, in *Ramsey*, 507 P.2d at 497, we recognized that when the negligent party embroils the injured party in litigation with a third party, the injured party is entitled to recover from the negligent party all costs of the third-party litigation.

In the present case, the jury determined that A/H's negligence and misrepresentations caused PCI and the City to become embroiled in arbitration. A/H's negligence caused damages to PCI that it sought to recover from the City under the terms of its construction contract. That contract required PCI to submit its claim to arbitration; if the City chose to defend its rights under the contract, it was likewise contractually bound to do so through the arbitration proceeding. Though precipitated by A/H's

negligence, PCI's arbitration claim was a contractual claim against the City, not an assertion of its tort claim against A/H. The contract between PCI and the City did not require or permit PCI to preserve or assert claims against A/H through arbitration.[30] Indeed, the contract expressly provided that PCI and the City were the only parties involved in the arbitration proceeding.

Given these circumstances, we find little merit to TH's claim that PCI's arbitration expenses amounted to costs of asserting its cause of action against A/H. The arbitration process is more readily likened to a third-party proceeding of the kind we considered in *Ramsey*. To the extent that the proceeding was caused by A/H's negligence or misrepresentations and generated costs incurred by PCI, PCI was entitled to an award against A/H for its expenses. We find no error in the trial court's decision to allow PCI's arbitration expenses to be treated as damages.[31]

### B. *Sufficiency of Damages Evidence*

#### 1. *Standard of review*

In reviewing the denial of a motion for a directed verdict or for a judgment

---

**29.** We stated in *Curt's Trucking*:

Whenever tortious injury is inflicted, the party suffering harm faces, at a minimum, disruption and inconvenience. In the process of protecting a claim and acting upon it, an injured party usually expends time, effort and money. Some of these items are readily quantifiable, while others either defy valuation entirely or are measurable only when the party suffering damage is a large organization with a specialized division to conduct the necessary claims activities. Such costs normally should be regarded as unrecoverable expenses which arise due to the inherent friction within our system of damage recovery through civil litigation. As such, they are not properly included as items of damage.

578 P.2d at 981 (footnote omitted) (citing *Rimer v. State Farm Mut. Auto. Ins. Co.*, 248 S.C. 18, 148 S.E.2d 742 (1966)).

**30.** The fact that PCI's claim against the City was not a necessary step in the preservation of its case against A/H distinguishes this case from *Rimer v. State Farm Mut. Auto. Ins. Co.*, 248 S.C. 18, 148 S.E.2d 742 (1966), which TH relies on as persuasive authority for its position.

**31.** PCI's right to recover the City's arbitration expenses arose from the City's assignment of its

rights to PCI. Since the jury found that the City's arbitration expenses resulted from A/H's negligence toward the City, not A/H's negligence toward PCI, the City's right to recover against A/H is subject to the same analysis that applies to PCI. TH nevertheless suggests that the entire sum of $136,271 awarded by the jury for the City's arbitration expenses reflects costs the City incurred "in developing its own claim for direct damages caused by the negligence of [A/H] and Ebasco during the claims and arbitration proceedings." TH contends that it would not be proper to award damages for such costs. Thus, TH argues, the award for the City's arbitration expenses should also be set aside. TH's entire argument on this point, however, is set out in a single conclusory paragraph that provides no meaningful basis for decision. We thus decline to consider this point. *See Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991) (holding that where a point is cursorily briefed it will not be considered on appeal).

TH separately contends that the evidence at trial does not support the jury's verdict for PCI's arbitration expenses and the City's arbitration expenses and administrative costs. We address this point below, as part of our discussion of TH's broader challenge to the sufficiency of PCI's damages evidence as a whole.

notwithstanding the verdict, this court asks whether, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could differ in their assessment of the particular issue. *See Gonzales v. Safeway Stores, Inc.*, 882 P.2d 389, 395 n. 4 (Alaska 1994).

### 2. *Procedural and legal background*

In order to recover lost profits in a breach of contract action, the plaintiff must present to the jury evidence sufficient to calculate the amount of the loss caused by the breach. *See City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979). Damages must be proved with reasonable certainty. *See Geolar, Inc. v. Gilbert/Commonwealth, Inc.*, 874 P.2d 937, 945–46 (Alaska 1994). The party seeking damages must provide a reasonable basis for computing the award. *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 154 (Alaska 1992).

Our cases have discussed four methods of proving damages in a construction contract case: the actual cost method, the total cost method, the modified total cost method, and the jury verdict method. *See Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 324–27 (Alaska 1992). The preferred method is the actual cost method, "in which each element of extra expense incurred because of the [alleged breach] is added up for a total claimed amount." *Id.* at 325.

By contrast, "[t]he total cost method calculates damages by determining the difference between the actual costs incurred on a project, plus a reasonable amount for profit, and the contract price." *Geolar*, 874 P.2d at 943. This method is disfavored because "it assumes that the defendant's breach was the cause of all of the extra cost," "it assumes plaintiff's bid was accurately computed," and it assumes that plaintiff was not responsible for increases in cost. *Fairbanks N. Star Borough v. Kandik Constr., Inc. & Assocs.*, 795 P.2d 793, 798 (Alaska 1990), *opinion vacated in part on reh'g*, 823 P.2d 632 (Alaska 1991) (relevant parts unaffected). For these reasons, the proponent of total cost evidence must establish that no other form of proof is practicable. *See Coluccio*, 826 P.2d at 325.[32]

Similar to the total cost method, and similarly disfavored, is the modified total cost method, which fixes amounts actually spent for various parts of a contract and compares those costs with some form of estimate-derived reasonable cost.[33] The "central aspect" of both the total cost and modified total cost methods "is a comparison between the contractor's initial estimates and the actual cost of performing the contract." *Geolar*, 874 P.2d at 944.

The fourth method of proof is the jury verdict method, "a variant on the actual cost approach which allows the contractor to 'present evidence of the cost of additional work to the finder of fact[,] including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects.'" *Coluccio*, 826 P.2d at 325 (quoting *New Pueblo Constr.*,

---

32. Impracticability of other methods is actually the first of four threshold requirements set out in *Coluccio;* the complete list is as follows:
 (1) the nature of the losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy;
 (2) the plaintiff's bid or estimate is realistic;
 (3) its actual costs were reasonable; and
 (4) it was not responsible for the added expenses.
 *Coluccio*, 826 P.2d at 325 (Alaska 1992).

33. We have described two variants of the modified total cost approach. The first was described in *Coluccio*, 826 P.2d at 324:
 FCCC relied on what it characterizes as a "modified total cost" method to prove its damages at trial. As its expert explained at trial, "In a modified total cost [analysis], ... [t]he normal procedure is to look at all the money that was spent, subtract all the money that was paid, and then take a deeper look." In other words, the damages are calculated by starting with the contractor's costs in excess of what it was paid, then attempting to back out any costs that are not attributable to the DSC.
 The second was described in *Geolar:*
 Geolar's calculations ... involved estimating how long Geolar should have taken to complete a given amount of work under its original estimates; comparing this amount of time to the amount of time the work actually took to complete; and multiplying the difference by the cost of labor, equipment, supervision, and overhead per unit of time.
 *Geolar*, 874 P.2d at 943–44 (Alaska 1994).

*Inc. v. State*, 144 Ariz. 95, 696 P.2d 185, 194 (1985)).

Before trial began, the trial court granted a motion by TH to prohibit PCI from relying on the total cost method to prove damages and requiring, instead, that damages be proved by the actual cost method:

> PCI must establish its damages, and any right to recovery, by means of the actual cost method of establishing damages. In other words, PCI must establish each element of extra expense incurred, and that each such expense was caused by defendants' negligence, before it will be entitled to an award for such expense.

At the conclusion of PCI's case-in-chief, TH filed motions for a directed verdict on damages, asserting that PCI's witnesses had failed to present an actual cost case, had relied instead on total cost evidence, and had failed to present sufficient evidence to establish causation of damages or to establish its damages with sufficient specificity. The trial court declined to direct a verdict against PCI, concluding that, although PCI's evidence incorporated some total cost elements, ample evidence of causation had been presented, particularly as to A/H; the court further concluded that specificity as to the amount of damages was of secondary importance.[34] Essentially, the court embraced the jury verdict method, stating, "It seems to me the way to handle this is a very carefully worded jury instruction ... which requires the jury to find causation with precision and to let them know that that was the burden that Plaintiffs had."

Accordingly, at the close of the case, the court defined the actual cost method and instructed the jury that "Plaintiff must use the actual cost method to establish its damages." The court defined the total cost method, as well, and instructed that "[y]ou may not use this method to determine PCI's damages, because it does not differentiate between the various entities which may have caused any damage to PCI."

The court also advised the jury, "you must have a reasonable basis for fixing damages in this case." The court warned that delay and damages in the performance of the powerline project could potentially have been caused by numerous contract participants other than A/H or Ebasco, and it told the jury that "[f]or each item of damages claimed ... you must determine that such item of damage was legally caused by [A/H] or Ebasco Services before making an award ... for that item."

On appeal, TH renews the objections it raised below. TH complains that the trial court erred in allowing PCI to present a case based entirely on total cost evidence. After undertaking an extensive review of the damages evidence, TH encapsulates its claim as follows:

> PCI's evidence ignored causation, and PCI witnesses simply assumed that all injuries were caused by A/H and Ebasco. That assumption duplicates the underlying premise, and the essential evidentiary weakness of the total cost approach. The jury had no evidentiary basis for distinguishing between injuries caused by A/H and those caused by PCI, Ebasco, the COS [City of Seward], CEA [Chugach Electric], the U.S.F.S [United States Forest Service] and others, therefore it could not *isolate* which specific injuries were caused by A/H. Since the jury could not isolate what injuries were caused by A/H, it therefore could not determine damages flowing from those injuries. Nor could the jury use the resultant percentage of fault to determine the damages relating to the arbitration expenses incurred by PCI and the COS or the COS's increased administrative costs.

---

34. In arguing the directed verdict motion, counsel for defendant Taylor effectively conceded that PCI's evidence established damages with specificity and that the only point at issue was causation:

> And I think—I think they've proved in spades to you that if we can prove—if they can prove causation, then they may have enough information as far as damages are concerned.... But they skip over the ultimate problem that they've had in this case from the very beginning, and that is proving who caused what damages. They simply don't have that.

In short, TH maintains that PCI's reliance on a total cost case left the jury with no rational basis for a verdict:

The jury's award can only be explained as a result of the averaging method, the adoption of an arbitrary percentage calculation, or the random selection of figures improperly based on speculation.

We disagree. TH's view of the case is not taken, as ours must be, in the light most favorable to PCI. *See Gonzales v. Safeway Stores, Inc.*, 882 P.2d 389, 395 (Alaska 1994). PCI's evidence cannot be dismissed as a mere total cost case.

Although the evidence included a healthy dose of information concerning the total cost of the delays, the jury heard detailed testimony concerning PCI's actual construction of the powerline project. Witnesses who had worked on the project told of the delays, frustrations, and economic problems PCI experienced; they recounted details of PCI's dealings with A/H and other contract participants; they described A/H's alleged misrepresentations and acts of negligence; and they tied those acts to specific problems in PCI's performance of the contract. The jury also heard a significant amount of cost analysis and received volumes of paperwork documenting and analyzing virtually every phase of construction. Some of the analysis was based on a total cost approach, but some was in the form of expert opinion, and much consisted of specific testimony and records memorializing PCI's actual work experience.

This admixture of evidence left the jury with much more to consider than "the difference between the actual costs incurred on a project, plus a reasonable amount for profit, and the contract price." *Geolar*, 874 P.2d at 943. In addition to establishing total project costs significantly exceeding the original contract price, the evidence strongly suggested that a substantial amount of PCI's added costs resulted from delayed and out-of-sequence delivery of powerline poles. The evidence also described instances in which A/H

misled PCI with regard to pole delivery, and it described the effects of A/H's misrepresentations and negligence on PCI's construction efforts. While PCI never submitted itemized proof of actual added costs attributable to A/H's misconduct, it presented enough information to support a strong inference that A/H had caused PCI a substantial amount of actual harm and to enable the jury to form a reasonable, though perhaps imprecise, estimate of the extent of that harm.

This is hardly a situation in which the jury was fed, and swallowed whole, a case based solely on total cost analysis. *See, e.g., Coluccio*, 826 P.2d at 327 ("Had the jury heard only FCCC's modified total cost theory and returned a verdict in the amount indicated by that theory ... reversal would be mandated."). As the trial court correctly recognized, the strong showing that A/H caused PCI actual harm was particularly significant in establishing the sufficiency of the damages evidence to submit to the jury, despite the relative weakness of PCI's evidence on precise damages. In a factually distinct but legally analogous situation, we recently observed:

It is, of course, the law that the *fact* of damages must be proven by a preponderance of the evidence. "To recover for future medical expenses one must prove to a reasonable probability that they will occur." *Blumenshine v. Baptiste*, 869 P.2d 470, 473 (Alaska 1994) (citing *Maddocks v. Bennett*, 456 P.2d 453, 458 (Alaska 1969)). Once the fact of damages has been proven to a reasonable probability, the *amount* of such damages, on the other hand, need only be proven to such a degree as to allow the finder of fact to "reasonably estimate the amount to be allowed for [the] item [of damages]." *Id.* (citing *Henderson v. Breesman*, 77 Ariz. 256, 269 P.2d 1059, 1061–62 (Ariz.1954)).

*Pluid v. B.K.*, 948 P.2d 981, 984 (Alaska 1997).[35]

---

**35.** Our holding in *Pluid* fully addresses and resolves TH's related argument that the jury's award of administrative and arbitration costs is unsupported because PCI failed to present evidence apportioning any specific portion of those costs to A/H's negligent acts. In our view, the evidence made it clear that A/H's acts resulted in substantial administrative and arbitration costs, and it sufficed to allow a reasonable estimate of those costs.

As the trial court also correctly recognized, the evidence in this case was suitable and sufficient to submit to the jury under the jury verdict method: [36]

> Courts have generally approved "jury verdict" awards, whether rendered by the judge or a jury, under similar circumstances—that is, where the contractor has sought to rely on a total cost approach, but the fact-finder has apparently gone beyond that method and rendered a verdict that seems fair and reasonable and is supported by substantial evidence.

*Coluccio*, 826 P.2d at 327. The jury heard substantial evidence unrelated to the total cost method; it was carefully and specifically instructed to ignore all that was not evidence of actual cost; [37] and its modest verdict—which fell far closer to TH's position than to PCI's—bears witness to its ability to sift through the chaff and find the grain. TH's motions for directed verdicts were properly denied.

### C. Deduction of Ebasco's Fees in the Underlying Case

TH contends that the trial court erred in refusing to deduct from the value of PCI's judgment in the underlying case an amount reflecting the prevailing-party attorney's fees that would have been awarded to Ebasco, who was found to be faultless. This argument is disposed of by our prior discussion of PCI's claim that its own prevailing-party fees against A/H should have been added to the judgment in the underlying case. *See supra* Part III.D.2. As we have already indicated above, the trial court did not abuse its discre-

tion in offsetting the attorney's fee awards and declaring them a "wash."

### D. TH's Attorney's Fees

#### 1. Standard of review

■ The trial court has broad discretion in awarding attorney's fees; we will not find an abuse of that discretion absent a showing that the award was "arbitrary, capricious, manifestly unreasonable, or ... stem[med] from an improper motive." *Bohna*, 828 P.2d at 766–67 (quoting *Tobeluk v. Lind*, 589 P.2d 873, 878 (Alaska 1979)); *see also Van Dort v. Culliton*, 797 P.2d 642, 644 (Alaska 1990).

#### 2. Discussion

■ As we have already discussed, the trial court awarded TH 30% of the attorney's fees incurred by defendants after their February 4, 1994, offer of judgment. The award adopted the percentage set out in former Civil Rule 82(b)(2) for prevailing parties who recover no money in cases that go to trial.[38] Relying on the factors listed in Rule 82(b)(3), TH requested an award exceeding the 30% guideline. The trial court denied the request, specifically finding that in light of all the facts before it no adjustment was called for.

TH argues that the trial court erred in failing to award enhanced fees. According to TH, the circumstances of this case are "exactly" what the provisions of former Rule 82(b)(3) were designed to address. PCI refutes the assertion, and the parties engage in an intense debate over the listed factors.

---

**36.** TH insists that the jury verdict approach, like the total cost and modified total cost approaches, is disfavored and cannot be applied unless proof by the actual cost method is impossible or highly impracticable. But we have never so held. In fact, *Coluccio* applied the jury verdict method to affirm a judgment after expressly finding that the case could not have been properly submitted under a modified total cost approach, because the plaintiff had failed to establish that it was the only approach available. *See* 826 P.2d at 326–27.

**37.** The trial court did not inform the jury of the four *Coluccio* factors that the jury was required to find before considering total cost evidence. *See supra* note 29. Such an instruction was

found critical in *Geolar*, 874 P.2d at 945–46. In the present case, however, the instruction was unnecessary, and could potentially have been undesirable, because the court directed the jury to rely on actual cost evidence and precluded it from considering total cost evidence under any circumstances. Perhaps for this reason, TH did not request a *Coluccio* instruction.

**38.** Rule 82 was amended substantially in 1997; however, the amended rule applies only to cases filed on or after August 7, 1997. Alaska Supreme Court Order No. 1281 (effective August 7, 1997). Therefore, the former version of Rule 82, which was in effect when PCI filed its complaint, governs.

We have never vacated a trial court's decision refusing to enhance fees under former Rule 82(b)(3). *See, e.g., Fairbanks N. Star Borough v. Lakeview Enters., Inc.,* 897 P.2d 47, 61–62 (Alaska 1995); *Aetna Cas. & Sur. Co. v. Marion Equip. Co.,* 894 P.2d 664, 671–72 (Alaska 1995) (declining to find an abuse of discretion where trial court awarded 20% fees to prevailing party and refused to enhance the award where party cited no authority for enhanced fee award); *cf. Municipality of Anchorage v. Gentile,* 922 P.2d 248, 264 (Alaska 1996) (discussing attorney's fees in class actions, where enhanced fees are permitted under Rule 82 and favored under Rule 23). TH has not persuaded us that the circumstances here are exceptional, and our review of the record convinces us that the trial court's fee decision was not arbitrary, capricious, or manifestly unreasonable. *See Bohna,* 828 P.2d at 766–67. It must therefore stand.

### E. *Remaining Issues*

#### 1. *Collectibility*

At trial, TH moved for a directed verdict on the ground that PCI had failed to present sufficient evidence to prove that a judgment in the underlying case would have been collectible against A/H or Ebasco. The trial court denied the motion. TH contends that this was error. In so contending, TH does not argue that the evidence at trial conclusively established that the underlying judgment could not have been collected; when viewed in the light most favorable to PCI, the evidence certainly would not compel this conclusion. TH argues, instead, only that PCI offered insufficient affirmative evidence to meet its burden of proving collectibility. But we have already held in Part III.C.4 that PCI did not bear the burden of proving collectibility; rather, TH bore the burden of proving uncollectibility. This holding disposes of TH's directed verdict claim.

#### 2. *Award of full fees as discovery sanction*

■ TH contends that the trial court erred in failing to award defendants full attorney's fees as a sanction for PCI's production of unprepared and unknowledgeable witnesses at depositions conducted under Civil Rule 30(b). The imposition of discovery sanctions is vested in the sound discretion of the trial court. *See Underwriters at Lloyd's London v. The Narrows,* 846 P.2d 118, 119 (Alaska 1993). Our review of the record convinces us that the court did not abuse its discretion here.

#### 3. *Failure to instruct on professional duties*

■ At trial, TH proposed that the trial court instruct the jury that PCI's attorneys were bound to perform only those legal services that they were hired to perform, to ensure all pleadings were well grounded in fact and warranted by existing law, and to avoid incurring unnecessary fees and costs. The court balked at the proposal, saying that it would be "totally unfair to [PCI] for me to be inserting myself into the position of expert witness for [TH] as to what the proper duties of the attorneys were." TH concedes that these issues were addressed by PCI's expert witness, but argues that the trial court should have accepted the proposed instruction since the evidence showed that PCI's president told its attorneys to "stand still." When read as a whole, however, the instructions actually given adequately informed the jury of the relevant law. *See Kavorkian v. Tommy's Elbow Room,* 694 P.2d 160, 166 (Alaska 1985).

We find no error.

#### 4. *Costs*

■ TH lastly challenges the trial court's order affirming the Clerk's Taxation of Costs. The award of costs is committed to the broad discretion of the trial court. *See Pavone v. Pavone,* 860 P.2d 1228, 1233 (Alaska 1993). The award will be affirmed " 'absent a clear showing that the trial court's determination was arbitrary, capricious, or manifestly unreasonable, or that it stemmed from an improper motive.' " *Alyeska Pipeline Serv. Co. v. Beadles,* 731 P.2d 572, 575 (Alaska 1987) (quoting *Alvey v. Pioneer Oil-*

*field Serv.*, 648 P.2d 599, 601 (Alaska 1982)). With three minor exceptions,[39] we conclude that the award of costs must be upheld under this standard.

## IV. CONCLUSION

This case is REMANDED for recalculation of prejudgment interest and amendment of the cost award as directed herein. In all other respects, the judgment is AFFIRMED.

FABE, J., not participating.

---

**39.** The three exceptions are as follows:

a. The Taylor & Hintze law firm seeks recovery of $1459.64 as one-third of the out-of-state airfare for a court reporter who traveled to depositions by agreement of the parties. They claim that PCI and defendant Robert Taylor were awarded pro rata costs for the reporter's airfare, and they complain of disparate treatment. At the cost hearing, the clerk declared that the cost was allowable; however, in the Clerk's Taxation of Costs for the Taylor & Hintze law firm (costs order 2 of 3), the expense was disallowed as "a convenience to the parties involved, rather than a necessity." The record before us does not disclose whether a comparable cost was allowed to PCI and defendant Taylor, and PCI has not responded to the claim of disparate treatment. Under the circumstances, we remand the issue

for clarification. The parties should be treated equally with respect to this item.

b. The second page of the Clerk's Taxation of Costs for defendant Taylor (costs order 3 of 3) clearly states that defendant Taylor should receive 3 days, at $66 per day, as travel expenses for Robert Benson. The total reached, however, is only $132 ($66 × 2), instead of the proper $198 ($66 × 3). This appears to be an error in computation and should be corrected on remand.

c. The final paragraph of the Clerk's Taxation of Costs for defendant Taylor (costs order 3 of 3) should reflect that costs included therein are awarded in favor of defendant Taylor and against PCI rather than in favor of PCI and against Taylor; it is clear from the context of the taxation of costs that this was intended.